Herman WOESSNER, et al.,
Plaintiffs-Appellants,

v.

JOHNS–MANVILLE SALES CORP., et al., Defendants-Appellees.

Nos. 84–3083, 84–3084 and 84–3268.

United States Court of Appeals,
Fifth Circuit.

April 15, 1985.

Gardner, Robein & Healey, Louis L. Robein, Jr., Robert H. Urann, Metairie, La., for plaintiffs-appellants in all cases.

Bert Wilson, Lafayette, La., James S. Thompson, New Orleans, La., for defendants-appellees in all cases.

Montgomery, Barnett, Brown & Read, James B. Irwin, New Orleans, La., for Raybestos-Manhattan.

Christovich & Kearney, W.K. Christovich, Michael M. Christovich, New Orleans, La., for Armstrong World Industries (Armstrong Cork Co.).

Porteous, Toledano, Hainkel & Johnson, James S. Thompson, New Orleans, La., for Pittsburgh Corning Corp.

Linda A. Liljedahl, Rene A. Pastorek, Windhorst, Pastorek & Gaudry, Gretna, La., for Celotex Corp.

Lemle, Kelleher, Kohlmeyer & Matthews, John C. Reynolds, Michael T. Cali, New Orleans, La., for Owens-Corning Fiberglas Corp.

Bienvenu, Foster, Ryan & O'Bannon, Robert N. Ryan, William L. Brockman, New Orleans, La., for GAF Corp.

Felix R. Weill, Mary H. Thompson, Watson, Blanche, Wilson & Posner, Baton Rouge, La., for Nicolet, Inc.

James E. Williams, Lake Charles, La., for Foster Division-Amchem Products, Inc. and Eagle-Picher Ind., Inc.

Vance Ellefson, New Orleans, La., for Eagle-Picher Industries, Inc.

McGlinchey, Stafford & Mintz, J. Michael Johnson, Linda S. Harang, New Orleans, La., for Combustion Engineering, Inc.

Bryan, Nelson, Allen & Schroeder, James N. Compton, Biloxi, Miss., Marie I. O'Byrne Stephenson, New Orleans, La., for Rockwool Mfg.

O'Keefe, O'Keefe & Berrigan, Stephen M. Bernstein, New Orleans, La., for Forty Eight Insulations, Inc.

M.N. Grossel-Rossi, New Orleans, La., for Standard Asbestos Mfg. Co. and/or Standard Insulations, Inc.

William C. Kaufman, III, Seal, Smith & Phelps, Baton Rouge, La., for Fibreboard Corp.

Kathleen M. Overcash, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Frank X. Neuner, Lafayette, La., for Keene Corp.

Barker, Boudreaux, Lamy & Foley, L.C., New Orleans, La., for plaintiffs-appellants in No. 84–3268.

Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Kathleen M. Overcash, Lafayette, La., for defendants-appellees in No. 84–3268.

Edmund E. Woodley, Woodley, Barnett, Cox, Williams & Fenet, Lake Charles, La., for Foster Division-Amchem Products, Inc.

Robert S. Rooth, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for Owens-Illinois Corp.

Before THORNBERRY, GARWOOD and HILL, Circuit Judges.

THORNBERRY, Circuit Judge:

The sole issue before this court is whether the appellants' tort claims were within the district court's admiralty jurisdiction, thus affording the appellants the doctrine of excusable laches and precluding summary dismissal of the claims. We are presented with three cases consolidated for appeal. Plaintiff-appellants Woessner, Gowland, and Eschette instituted these actions in 1982, seeking to recover damages for injuries caused by exposure to asbestos-containing products manufactured and distributed by the appellees. Appellants alleged jurisdiction to be proper under diversity and admiralty. The district court granted summary judgment in favor of appellees, holding that the appellants' causes of action were barred by the one year statute of limitations established by Louisiana Civil Code Articles 3536 and 3537. The court also held that the appellants failed to invoke the court's admiralty jurisdiction because the alleged wrongs do not bear a

significant relationship to traditional maritime activity.[1] Appellants now challenge the district court's holding that the claims did not invoke the court's admiralty jurisdiction. We affirm.

FACTS:

All three appellants are land-based career insulators and long-time members of Asbestos Workers Local No. 53. All three were employed throughout their careers by various insulation contractors in Louisiana who were engaged in both maritime and non-maritime insulation work. Woessner's career lasted approximately forty years, from 1932 to 1972. He estimates that 60% of his work during that period was maritime related. This work was performed on ships both in and out of navigation (including some anchored in midstream), and consisted of stripping old insulation and applying new insulation to vessels' boilers, turbines, fire lines, and pipes. In 1972, Woessner discovered he had contracted asbestosis.

Gowland worked as an insulator for twenty-four years. Approximately 25% of his career was spent insulating ships located in shipyards, dry dock areas, and on navigable waters. Gowland often repaired old and torn insulation while ships were loading and unloading cargo and on several occasions made repairs on ships as they navigated the Mississippi River. Gowland was diagnosed as having asbestosis in 1976.

Appellant Eschette's career lasted twenty-five years, from 1948 to 1977, and approximately 60% of that time was spent insulating ships located in shipyards, dry dock areas and on navigable waters.[2] Eschette's work involved insulation of ships under construction, repair of insulation during loading and unloading and, occasionally, repairs of insulation while the ships were in navigation.

All three appellants also spent significant parts of their careers applying insulation in a wide variety of non-maritime settings.

INTRODUCTION

The Constitutional source of the federal courts' admiralty jurisdiction is Article III, Section 2 of the United States Constitution, which extends the judicial power of the United States "to all Cases of admiralty and maritime Jurisdiction." In Section 1333 of the Judicial Code, Congress vested the federal district courts with original and exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, savings to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1).

Traditionally, the determination whether a tort was "maritime" and thus within the admiralty jurisdiction of the federal courts depended upon the locality of the alleged wrong. "If the wrong occurred on navigable waters, the action is within admiralty jurisdiction; if the wrong occurred on land, it is not." *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972). In *Executive Jet,* the Supreme Court, stating that the Court "has never explicitly held that a maritime locality is the sole test of admiralty jurisdiction," recognized that "[i]t is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity." *Executive Jet,* 409 U.S. at 258, 268, 93 S.Ct. at 499, 504. *Executive Jet* held that tort claims arising from airplane accidents occurring in navigable waters are not cogni-

1. The Motions for Summary Judgment in *Gowland v. Johns-Manville Sales Corp.* and in *Woessner v. Johns-Manville Sales Corp.* were heard by the Honorable Charles Schwartz, Jr. on December 21, 1983 in a consolidated hearing. Judge Schwartz heard the Motion for Summary Judgment in *Eschette v. Johns-Manville Sales Corp.* on March 28, 1984. The court granted summary judgment against each plaintiff and issued a statement of "Order and Reasons" in each case. Only the opinion in plaintiff-appellant Woess-

ner's case was published. *Woessner v. Johns-Manville Sales Corp.,* 576 F.Supp. 596 (E.D.La. 1984). The orders and reasons in the *Gowland* and *Eschette* cases are substantially identical to the published *Woessner* opinion.

2. This includes time Eschette spent repairing insulation on submersible drilling rigs in the Gulf of Mexico.

zable in admiralty unless the alleged wrong bears a significant relationship to traditional maritime activity. Although the holding of *Executive Jet* was expressly limited to aviation tort claims, this court, in *Kelly v. Smith*, 485 F.2d 520 (5th Cir.1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), held that the rationale underlying the significant relationship, or "nexus", requirement of *Executive Jet* is applicable in all maritime tort cases. The Supreme Court approved this holding in *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 673, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982).

■ On the basis of the Supreme Court's holdings in *Executive Jet* and *Foremost*, this circuit has consistently held that in order for a tort claim to be within the federal courts' admiralty jurisdiction, the alleged wrong must have a maritime locality *and* must bear a significant relationship to traditional maritime activity. *Smith v. Pan Air Corp.*, 684 F.2d 1102, 1108 (5th Cir., 1982); *Sohyde Drilling & Marine Co. v. Coastal Gas Producing Co.*, 644 F.2d 1132, 1135 (5th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981).

## MARITIME LOCALITY

The first prong of the jurisdictional test is whether the alleged tort has a maritime locality. The district court held that the locality test had been met in this case and appellees do not contend otherwise.

■ Under the locality test, a tort occurs "where the alleged negligence took effect," rather than where the negligent acts or omissions occurred. *Executive Jet*, 409 U.S. at 266, 93 S.Ct. at 503. In products liability cases this court has held that the locality requirement is satisfied where a defective product furnished in the construction of a ship later caused damage or injury on navigable waters, even though the defendant's alleged wrong occurred on land. *Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 174 (5th Cir.1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); *Watz*

*v. Zapata Off-Shore Co.*, 431 F.2d 100, 109–110 (5th Cir.1970).

The injury to appellants was the contraction of asbestosis caused by exposure to asbestos dust. Although the alleged wrongful acts and omissions occurred on land, for jurisdictional purposes the tort occurred where the appellants were exposed to the asbestos. In *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), this court discussed the nature of asbestos-related disease:

> ... inhaling asbestos dust in industrial conditions, even with relatively light exposure, can produce the disease of asbestosis. The disease is difficult to diagnose in its early stages because there is a long latent period between initial exposure and apparent effect.... This latent period is explained by the fact that asbestos fibers, once inhaled, remain in place in the lung, causing a tissue reaction that is slowly progressive and apparently irreversible. Even if no additional asbestos fibers are inhaled, tissue changes may continue undetected for decades. By the time the disease is diagnosible, a considerable period of time has elapsed since the date of injurious exposure. Furthermore, the effect of the disease may be cumulative since each exposure to asbestos dust can result in additional tissue changes. A worker's present condition is the biological product of many years of exposure to asbestos dust, with both past and recent exposures contributing to the overall effect. All of these factors combine to make it impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease.

*Id.*, at 1083. Since each exposure to asbestos dust contributed to appellants' injuries, appellants' claims meet the locality requirement to the extent that the claims arise from exposures to asbestos dust while aboard vessels in navigable waters. All three appellants alleged in their complaints that they were exposed to asbestos while repairing vessels lying in navigable waters.

## NEXUS REQUIREMENT

The district court found that the wrongs alleged in the complaints did not bear a significant relationship to traditional maritime activity. Appellants challenge the district court's analysis and conclusion.

The threshold question in this case is what the proper analysis should be for determining whether appellants' injurious exposure to asbestos dust while working aboard vessels in navigable waters bears a "significant relationship to traditional maritime activity." The only case in this circuit that has addressed this issue is *Lowe v. Ingalls Shipbuilding, A Division of Litton,* 723 F.2d 1173 (5th Cir.1984). *Lowe* was an action for a declaratory judgment that a shipyard employer who pays compensation under the Longshoremen's and Harbor Workers' Compensation Act to employees who contracted asbestosis has a cause of action against the asbestos manufacturers for the excess of the compensation paid over the amount of settlement between the employees and the manufacturer. On appeal this court *sua sponte* raised the question of subject matter jurisdiction. *Id.,* at 1176–77. We found that the district court lacked diversity and federal question jurisdiction and held that the existence of admiralty jurisdiction over the employer's action against the manufacturers depended on whether the employees' claims against the manufacturers would be governed by general maritime law. *Id.,* at 1184–1185. After discussing the approaches taken by other circuits, we held that the complaint and the record in *Lowe* were insufficient to show admiralty jurisdiction because there were no allegations as to where the employees' exposure to asbestos occurred, the nature of the employees' employment, or the nature of the use of the asbestos products. *Id.,* at 1190. We stated that "it is not inconceivable that one or more of the plaintiffs would be able to establish admiralty jurisdiction by amended complaint," but we did not decide

and expressly reserved the question of what particular circumstances would satisfy the nexus requirement. *Id.* We also reserved the question of what analysis should be employed to make this determination. *Id.*

This Court, in *Kelly v. Smith,* 485 F.2d 520 (5th Cir.1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), outlined four factors to be considered in determining the existence of a substantial maritime relationship: the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law. 485 F.2d at 525. While this circuit has followed the *Kelly* analysis, no panel of this Court has ruled on a claim of admiralty jurisdiction in a case such as this, where land-based workers seek to hold land-based manufacturers liable for injuries resulting from contraction of an industrial disease. We therefore find it necessary to examine the approaches taken by circuits that have addressed the issue.

Five other circuits have addressed the *Executive Jet* nexus requirement in the context of tort claims brought by land-based asbestos workers. Only the Fourth Circuit has held that the claims of the shipyard employees against the manufacturers of asbestos products is within the federal courts' admiralty jurisdiction. *White v. Johns-Manville Corp.,* 662 F.2d 234 (4th Cir., 1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982),[3] involved tort claims by shipyard employees who had installed insulation at shipyards, at dry dock areas, and aboard vessels in navigable waters. The plaintiffs did both construction and repair work. The court held that the wrongs complained of bore a significant relationship to traditional maritime activity. *Id.,* at 239. In so holding, the court found that:

> ... installation of insulation materials, which by their very nature become an

---

**3.** The Fourth Circuit granted rehearing *en banc* in the case of *Oman v. Johns-Manville Corp.,* No. 82–1821L for the purpose of considering whether *White* should be overruled. Oral argument was heard in *Oman* on October 2, 1984, and is now pending decision.

appurtenance, or integral part, of the ship, is clearly essential to the maritime industry. Therefore, the work done by these shipyards bears a "significant relationship to traditional maritime activity" because the installation of the asbestos products has ( a direct effect on marine navigation and commerce.

*Id.* The court also placed special emphasis on the fact that the asbestos products involved "were designed, advertised and marketed as maritime asbestos products." *Id.,* at 240.

The Second Circuit in *Keene Corp. v. United States,* 700 F.2d 836 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983), also emphasized the relationship between the manufacture and use of the asbestos products and maritime activity. The court, however, reached the opposite result from the court in *White. Keene* was a suit for indemnity by an asbestos manufacturer against the government. The court held that it was "critical" to the case that Keene did "not allege that its insulation was designed specifically for maritime use. Indeed, it appears from the complaint that it was used in a variety of land-based plants and refineries." *Id.,* at 844. In holding that the nature of the manufacturer's product was a critical element, the Second Circuit expressly declined to follow the reasoning of the Fifth Circuit in *Sperry Rand Corp. v. Radio Corp. of America,* 618 F.2d 319 (5th Cir.1980) in which we held that in order for a products liability claim to invoke the admiralty jurisdiction of the court it was not necessary that the product be designed specifically for marine use. *Id.,* 700 F.2d at 845.

In *Austin v. Unarco Industries, Inc.,* 705 F.2d 1 (1st Cir.), *cert. dism'd,* —— U.S. ——, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983), the First Circuit held that the claims of the

plaintiffs, survivors of a shipyard employee, against asbestos manufacturers were non-maritime. The plaintiffs' decedent was exposed to asbestos dust while painting over freshly applied asbestos insulation and sweeping up insulation scraps. He worked on ships under construction and ships brought in for major repairs. In deciding whether the nexus requirement had been met, the court developed an analysis that focused on the function the person was performing when the injury occurred. *Id.,* at 11–12. The court relied primarily on the distinctions drawn in seaworthiness cases.[4] The court then found that the plaintiffs' decedent was not doing work traditionally done by members of the crew because the ships he had worked on were either under construction or laid up so as to be "temporarily incapable of acting as" ships and because the work "was a major project involving specialized tools and skills, both in kind and magnitude far beyond that traditionally done by a ship's crew." *Id.,* at 14. Consequently, the court held that the plaintiffs' claim did not bear a significant relationship to traditional maritime activity and did not invoke the court's admiralty jurisdiction. *Id.*

The plaintiffs in *Harville v. Johns-Manville Products Corp.,* 731 F.2d 775 (11th Cir.1984) were long-time employees of shipyards and worked as pipefitters and insulators in both the construction and repair of vessels lying in navigable waters. The issue in *Harville* was one of choice of law, but the decision turned on a determination of whether admiralty jurisdiction could be invoked in the case. *Id.,* at 778–79. In discussing the question of admiralty jurisdiction the court found that the "other Courts of Appeals that have faced this issue have demonstrated little agreement about those factors that are critical to the 'nexus' analysis." *Id.,* at 783. The court

---

**4.** The doctrine of unseaworthiness was introduced to the general maritime law in 1903 in *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. The doctrine imposed a species of liability without fault on the part of the ship owner. *Seas Shipping Co. Inc. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) rejected the notion that the ship owner's duty to furnish a

seaworthy vessel extended only to seamen employed directly by him on the vessel. Later cases recognized that the ship owner's warranty of seaworthiness was owed to harbor workers who provided services traditionally done by seamen. These harbor workers are referred to as *"Sieracki* seamen".

held that a proper analysis of the nexus requirement involved examination of the four *Kelly v. Smith* factors. *Id.*, at 784. The court rejected the analyses of the First, Second, and Fourth Circuits on the ground that those courts reached their holdings after exclusive focus on only one of the *Kelly* factors. *Id.* The court then analyzed the facts in light of the *Kelly* factors and concluded that the alleged wrong did not bear a significant relationship to traditional maritime activity. *Id.*, at 787.

The Ninth Circuit has addressed the issue in two opinions. *Owens-Illinois, Inc. v. United States District Court*, 698 F.2d 967 (9th Cir.1983) was an action by shipyard employees against the manufacturers of asbestos products. The employees were exposed to asbestos while working in boiler rooms of ships under construction. The court, relying in part on our opinion in *Hollister v. Luke Construction Co.*, 517 F.2d 920 (5th Cir.1975) (holding that an injury to a ship construction worker on board a ship under construction and lying in navigable waters is not a maritime tort), held that the torts "lack the 'maritime flavor' necessary to invoke the jurisdiction of the federal courts under 28 U.S.C. § 1333(1)." *Owens*, 698 F.2d at 970. In *Myhran v. Johns-Manville Corp.*, 741 F.2d 1119 (9th Cir.1984), the Ninth Circuit was faced with claims by employees who were exposed to asbestos while fitting pipes and doing minor repairs on vessels on navigable waters. In reaching the conclusion that the claims did not satisfy the nexus requirement, the court analyzed the facts in light of the four *Kelly* factors and relied extensively on the Eleventh Circuit's opinion in *Harville*.

■ *Kelly v. Smith* is the law in this circuit and we believe that it correctly identifies the factors relevant to the determination of whether a tort claim bears a significant relationship to traditional maritime activity. We agree with the Eleventh Circuit's statement in *Harville* that although each of the other courts that has considered this issue "has examined a factor or factors that we consider important to the proper analysis of the nexus requirement, we believe that exclusive focus on any single aspect of the plaintiffs' claims produces a mechanistic analysis not entirely consistent with the thrust of *Executive Jet.*" *Harville*, 731 F.2d at 784. Accordingly, we reject the analyses of the Second and Fourth Circuits in *Keene* and *White* to the extent that those courts gave controlling effect to the maritime nature of the asbestos products. Following our opinion in *Sperry Rand*, 618 F.2d 319 (5th Cir. 1980), we decline to *require* that there be some independent connection between the defendant's product and traditional maritime activity. We do not hold that the maritime nature of the product, or lack thereof, is an irrelevant consideration; rather, we hold that this factor is not dispositive. Indeed, *Kelly* requires that we do consider the nature of the instrumentalities involved.

■ The First Circuit in *Austin* gave controlling significance to the function and role of the injured party and focused on the factors controlling in seaworthiness cases. *Austin*, 705 F.2d at 11. The *Austin* court found that the injured party was not a *Sieracki* seaman; that is, at the time of the injury he was not doing work traditionally done by members of the crew. Consequently, the court declined to exercise admiralty jurisdiction. The language of the court's opinion suggests that had the plaintiffs' decedent been found to be a *Sieracki* seaman, admiralty jurisdiction over the tort claim would have been proper. *Id.* In *Lowe*, we found the *Austin* court's reasoning persuasive but reserved the question whether to adopt fully the *Austin* position. *Lowe*, 723 F.2d at 1190. We now decline to adopt fully the *Austin* position for several reasons. First, *Kelly* suggests that the function and role of *each* of the parties to the litigation is to be considered; moreover, *Kelly* enumerated three other factors to be considered in the nexus analysis. Second, and more importantly, we do not believe that appellants' status as *Sieracki* seamen for seaworthiness purposes should be dis-

positive of the question of admiralty jurisdiction over a tort claim against a non-maritime defendant.[5]

This Court has recognized that the federal courts' power over claims of unseaworthiness is governed by considerations distinct from those governing the existence of admiralty jurisdiction over tort claims arising from the same injury. In *Delome v. Union Barge Line Co.*, 444 F.2d 225 (5th Cir.), *cert. denied*, 404 U.S. 995, 92 S.Ct. 534, 30 L.Ed.2d 547 (1971), we held that jurisdiction over a shore-based shipfitter's seaworthiness claim against the ship owner did not depend on there being federal admiralty jurisdiction over a negligence claim against the ship owner arising from the same injury. In that case the injury occurred on a barge located on a marine railway with no part of it over navigable water. Although the court found that the vessel was "in navigation," it was not in navigable waters when Delome was injured and thus the locality requirement was not met and there was no admiralty tort jurisdiction over his negligence claim. The ship owner argued that the seaworthiness claim should have been dismissed for the same reason. Although we ultimately rejected the seaworthiness claim, we refused to do so on the ground that maritime tort jurisdiction had not been invoked. We recog-

nized that "[t]he warranty of seaworthiness in personal injury cases essentially depends on neither common-law tort nor contract concepts. Instead, while the seaworthiness doctrine is comprised of both tort and contract elements, it is a creature of twentieth-century judicial policy concerning risk distribution in the shipping industry." *Id.*, at 229 (citations omitted). We further stated: "To hold, then, that this uniquely maritime cause of action is circumscribed by the same admiralty jurisdictional boundaries as common-law 'land' torts would contravene the risk distribution policy underlying the doctrine as well as common sense." *Id.*, at 230. Seaworthiness actions are "uniquely maritime" because the warranty of seaworthiness was considered an absolute and nondelegable duty owed by the ship owner to the men performing maritime service on the vessel. The duty arose out of the special relationship created when a worker performed the ship's service with the ship owner's consent. *Sieracki*, 328 U.S. at 87, 66 S.Ct. at 878.[6]

Although the jurisdictional issues in *Delome* are distinct from those before us now, the case well illustrates the fact that seaworthiness claims are unique creatures of the maritime law. Under the seaworthiness cases, when a land-based maritime

---

5. We recognize that the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act abolished actions by a "person covered under" the Act against a third-party ship owner "based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred." 33 U.S.C. § 905(b). This court has held that the amendments to the LHWCA were effective to abolish seaworthiness actions by *Sieracki* seamen who are covered by the Act, but that the seaworthiness remedy remains available to *Sieracki* seamen not covered by the Act. *Burks v. American River Transport Co.*, 679 F.2d 69 (5th Cir.1982); *Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir.1981). Appellants in the case before us are "covered" by the Act and thus would not be entitled to a seaworthiness remedy even if they were found to be *Sieracki* seamen.

Although the term "*Sieracki* seaman," referring to a harbor worker to whom the warranty of seaworthiness is owed, became outmoded under the 1972 Amendments, the principle of the *Sieracki* seamen—a harbor worker doing

traditional work of a seaman, otherwise survives. *Burks*, 679 F.2d at 71, n. 1.

6. Delome's seaworthiness claim was ultimately rejected because he was not performing the kind of work that would have made him a *Seiracki* seaman. We did state, however, that if Delome had been a *Seiracki* seaman, the court would have had jurisdiction to consider his seaworthiness claim even though the locality requirement had not been met. We now recognize that this suggestion in *Delome*—that there is admiralty jurisdiction over a seaworthiness claim based on a land-occurring injury to a *Seiracki* seaman where jurisdiction is not afforded by the Admiralty Extension Act—probably did not survive the Supreme Court's decision in *Victory Carriers v. Law*, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). Nevertheless, *Delome's* discussion of the nature and purpose of seaworthiness actions is illustrative of the fact that the admiralty boundaries are not and should not be the same for seaworthiness claims and for ordinary tort claims.

worker's injury is caused by the condition of a vessel or her appurtenances and the vessel is in navigable waters, the only issue is whether the worker is one to whom the warranty is owed. If so, admiralty's power over the vessel owner and the unseaworthiness claim is absolute and unquestioned. This is in strong contrast to ordinary tort claims against a non-maritime defendant. Such claims are not "uniquely maritime" and admiralty's power over the claim must be based on more than the function the injured party was performing at the time of the injury. Certainly a finding that a plaintiff was doing work traditionally done by members of the crew suggests that the wrong bears a significant relationship to traditional maritime activity and would counsel strongly in favor of exercising admiralty jurisdiction; however, where neither the defendant, the injury, nor the instrumentality of the injury has any particular connection to maritime navigation or commerce, other concerns such as the demands of federalism may override. Likewise, we do not believe that a plaintiff's lack of *Sieracki* seaman status necessarily precludes admiralty jurisdiction over his claim where the claim is encompassed within the traditional concerns of admiralty law or where resolution of the claim would have a particularly strong impact on maritime navigation or commerce. We therefore agree with the *Austin* court that analogy to seaworthiness cases is probably the best approach to take in analyzing the relationship between the plaintiff's function and traditional maritime activity (the first *Kelly* factor); however, we disagree with *Austin* to the extent that it holds that this analysis is dispositive of the jurisdiction issue.

■ We hold that in "perverse and casuistic borderline situations," *Executive Jet*, 409 U.S. at 255, 93 S.Ct. at 498, the propriety of assuming admiralty jurisdiction over a tort claim can be determined only by looking at all of the *Kelly* factors. The first three *Kelly* factors examine the relationship between the parties, the injury, and the instrumentalities of the injury and traditional maritime activity. The last *Kel-*ly factor requires that we examine whether exercise of federal admiralty jurisdiction over the claim would otherwise advance the policies behind a uniform law of admiralty. Where some of the factors counsel in favor of assuming admiralty jurisdiction and some against, particular emphasis should be placed on the fourth factor—the traditional concepts of the role of admiralty law. In such cases the national interest in uniformity of the law governing the care and safety of those engaged in maritime service should be balanced against the demands of federalism and the interest in preventing the displacement of state law where similar claims have traditionally been relegated to local resolution. Since the claims of these land-based workers against the manufacturers and distributors of asbestos products present such a "borderline" situation, we turn now to the analysis of the four *Kelly* factors to determine whether the claims bear a significant relationship to traditional maritime activity.

### (1) *Functions and roles of the parties*

*Kelly* states that the function and role of each of the parties is an important consideration in the jurisdiction analysis. The Eleventh Circuit in *Harville* considered the maritime functions of the defendants as well as of the plaintiffs. *Harville*, 731 F.2d at 784. This court in *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132 (5th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981), also recognized that the role of the defendants must be considered. *Id.*, at 1136.

In the cases before us, the defendants are all land-based manufacturers and distributors of asbestos products and are in no way uniquely tied to the maritime industry. Their products, although important components in the construction and maintenance of vessels, are also used in all manner of non-maritime construction and were not designed specifically for maritime use. The mere fact that defendants provide a product that ends up on vessels, without more, is insufficient to justify the extension of

admiralty jurisdiction; and the lack of any unique maritime connection counsels against the extension of admiralty jurisdiction to this dispute.

Appellants argue that their functions aboard vessels in navigable waters were so tied to maritime activity that admiralty jurisdiction should be invoked. They argue first, relying on *White*, that their jobs of repairing and replacing asbestos insulation aboard ships in navigation were crucial to the performance of the maritime functions of the vessels. The holding in *White* that admiralty jurisdiction applied to the claims of land-based asbestos workers was based in part on the importance of the plaintiffs' roles. The court stated that "[w]ithout such shipyard efforts, these vessels would have been unable to perform their maritime role as carriers of people and cargo. Thus, installation of insulation materials ... is clearly essential to the maritime industry. Therefore, the work done by these shipyards bears a "significant relationship to traditional maritime activity." *White*, 662 F.2d at 239. This reasoning has been rejected. *Lowe*, 723 F.2d at 1188; *Harville*, 731 F.2d at 784; *Owens*, 698 F.2d at 971. We agree with the Eleventh Circuit in *Harville* that more is required than merely importance to the maritime industry:

> Here the plaintiffs' occupations were undeniably connected to maritime commerce; indeed, the plaintiffs' work is vital to the shipping industry. But *importance* to maritime commerce is not alone sufficient to bring an activity within the scope of admiralty jurisdiction.... More germane is whether the activity itself is of a "maritime" nature.

*Harville*, 731 F.2d at 784 (emphasis in original). We agree with the courts in *Austin* and *Harville* that in examining the relationship between the plaintiffs' function and traditional maritime activity, we should look to the factors that governed in seaworthiness cases. "[T]he question properly asked is whether the actual tasks the workers perform bear any inherent relationship to maritime activity, that is, whether the plaintiffs' jobs are identical to those undertaken by land-based workers and are

connected to maritime affairs merely because performed aboard ship, or whether they are tasks somehow unique to maritime service or work traditionally done by seamen." *Harville*, 731 F.2d at 784–85. The plaintiffs in both *Harville* and *Myhran* were engaged in activities nearly identical to those of Woessner, Gowland, and Eschette—their exposure to asbestos aboard vessels in navigable waters occurred while doing repairs that involved tearing out and replacing asbestos insulation. Both courts found that the plaintiffs were not doing work traditionally done by seamen. The *Harville* court found that:

> The plaintiffs here were engaged in trades, such as pipefitting, welding, and insulating, linked more with the land than with the sea. Their skills and training are those of landsmen, not of sailors.

*Harville*, 731 F.2d at 785. In the cases before us, the district court found as to each appellant that:

> The justification for admiralty's special protection for maritime injuries is that seamen are the wards of admiralty. That protection has been extended to those who are serving the same functions as seamen would serve. To afford this protection to workers such as plaintiff would be to create an extension that goes beyond the policy justifications of providing protections to seamen and others who perform the work of seamen.... [W]e cannot say that the work he performed was work traditionally done by members of the crew.

*Woessner v. Johns-Manville Sales Corp.*, 576 F.Supp. 596, 598 (E.D.La.1984); Eschette, Order and Reasons, at 4; Gowland, Order and Reasons, at 4. Appellants contend that the district court's finding is erroneous and that although the courts in *Harville* and *Myhran* applied the correct analysis, their conclusions were incorrect.

The warranty of seaworthiness was extended to shore-based workers who performed work traditionally done by members of the crew in *Seas Shipping Co. Inc. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90

L.Ed. 1099 (1946). The Supreme Court later expressly limited the vessel owner's duty to nonseamen to situations where the workers were doing "ship's work". *West v. United States*, 361 U.S. 118, 122, 80 S.Ct. 189, 192, 4 L.Ed.2d 161, 165 (1959). In the case of shore-based workers who did repairs on vessels, this determination is to be made by focussing upon "the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen is doing on shipboard at the moment of injury." *Id.*

Appellants allege that the work they did aboard vessels was work traditionally done by members of the crew. The only evidence in the record on this question are the exhibits attached to the various memoranda in opposition to the defendants' motions for summary judgment. Gowland and Eschette each executed an affidavit stating:

> It was customary practice to leave asbestos cement and pipecovering aboard the ship so that repairs could be finished by the crew if not completed in time and so the crew could make repairs at sea if the need arose.

After referring to this affidavit, Eschette's memorandum states: "That the need arose is clearly documented in a recent study by Jones, *et al,* 'Radiographic Evidence of Asbestos Effects in American Marine Engineers'." This article was also attached as an exhibit. Oddly enough, appellees rely on this same article, contending that it contradicts the appellants' factual allegations and supports the district court's finding that appellants did not do work traditionally done by the crew.

Appellants worked out of the Asbestos Local Union. They did not work continually for one employer; rather, they contracted out for individual jobs. Appellants' maritime-related activity usually occurred when they were signed out to a shipyard or insulating contractor. Appellants were then sent aboard vessels during loading and unloading to do wide-scale repair and application of insulation to the vessel's equipment. Appellants patched loose insulation and stripped and replaced worn or torn insulation. Each of the appellants were members of Asbestos Local Union 53 and had undergone two to four year apprentice programs during which time they received on-the-job training in the proper application of insulation and in the proper use of the tools and insulation products. It is undisputed that members of ships' crews do not receive specialized training in the use and installation of insulation products.

The study upon which both parties rely is Jones, *et al, Radiographic Evidence of Asbestos Effects in American Marine Engineers,* 26 Journal of Occupational Medicine 281 (1984). The subjects of the study were all active or retired members of the union of licensed marine engineers. These marine engineers were assigned to the engine department of U.S. merchant vessels and were responsible for operating and maintaining the propulsion plant. *Id.* The marine engineer's job is to operate and maintain the boilers, steam lines, and turbines. This includes making emergency repairs to the propulsion plant that must be made while underway. *Id.,* at 281–82. Marine engineers are exposed to asbestos dust when a piece of equipment is in need of repair. The engineer must strip the insulation in order to reach the equipment. *Id.,* at 282. After the repair is done, the engineer reapplies the insulation to the exposed equipment. *Id.* This is why small quantities of insulation products are left aboard the vessel by workers such as appellants.

The marine engineers are specialists who maintain and operate the vessel's propulsion plant. They have received no specialized training in applying insulation products, and there is no evidence in the record that they undertake to do routine repair or replacement of insulation that has become worn or torn. Their exposure to asbestos dust is merely incidental to their main function of repairing the equipment.

One of the factors *West* instructs us to focus upon is the pattern of the repairs. *West,* 361 U.S. at 122, 80 S.Ct. at 192. The proper inquiry is "whether the repair

*project* —not the specific task—is one that 'seamen' historically have performed." *Watz v. Zapata Off-Shore Co.*, 431 F.2d 100, 107 (5th Cir.1970) (emphasis in original). Moreover, "the pattern of repair must reflect work *traditionally* and *ordinarily* done by seamen, excluding persons performing such tasks as making major repairs requiring drydocking or special skills." *Waganer v. Sea-Land Service, Inc.*, 486 F.2d 955, 958 (5th Cir.1973) (emphasis added). Marine engineers and shore-based insulation workers do not engage in the same type of "project." Marine engineers maintain and repair the equipment that propels the vessel. Workers such as appellants, on the other hand, go aboard vessels for the specific purpose of ensuring that the insulation covering the vessel's equipment is in good shape. Usually this involves large-scale stripping and/or applying insulation where it has become worn. There is no evidence in the record that marine engineers or any other crew members historically or ordinarily performed this function. This is not surprising since appellants' trade requires special skills and training that crew members have not acquired. As *Waganer* suggests, the necessity of special skills and equipment also counsels against finding that appellants' work is the work of seamen. We agree with the Eleventh Circuit that the appellants' "skills and training are those of landsmen, not of sailors." *Harville*, 731 F.2d at 785. Although some crew members—the marine engineers—are exposed to asbestos dust in the course of performing their duties, we hold that the district court's finding that appellants were not engaged in work traditionally done by crew is not clearly erroneous.

Analysis of the first *Kelly* factor therefore does not advance appellants' argument in favor of invoking admiralty jurisdiction over these claims.

**(2)** *Types of vehicles and instrumentalities involved*

The vehicles involved in the appellants' injuries were vessels lying in navigable waters. Although the involvement of vessels would, in most tort claims, seem to implicate maritime concerns, their involvement in this case is at most tangential. Apart from the advantages appellants might receive from having their claims heard in a federal court under its admiralty jurisdiction, nothing about the underlying claims would be different if all of the appellants' exposure had occurred during the construction or repair of buildings on land. The involvement of vessels here is too attenuated to justify admiralty jurisdiction.

The instrumentality involved is asbestos insulation. Unlike the asbestos products in *White*, the products involved in this case have no uniquely maritime character. In addition, the "tools and safety equipment (or lack thereof) present in the installation and clean-up of asbestos—unlike the navigational equipment and safety devices of a vessel—possess few maritime attributes." *Myhran*, 741 F.2d at 1122, *quoting, Owens-Illinois Inc. v. United States District Court*, 698 F.2d 967, 971 (9th Cir.).

Appellants argue that our decision in *Sperry Rand* precludes us from considering the fact that the asbestos products are not uniquely maritime. We disagree. In *Sperry Rand*, a vessel was grounded and involved in a collision because of a defect in the gyro-pilot steering system. *Sperry Rand Corp. v. Radio Corp. of America*, 618 F.2d 319 (5th Cir.1980). Sperry Rand, the manufacturer of the system, settled with the vessel owners and then determined that the failure was caused by defects in some of the component parts. Sperry Rand filed suit against RCA, the manufacturer of the component parts, alleging admiralty jurisdiction. In discussing whether Sperry Rand had stated a claim within the court's admiralty jurisdiction, this court rejected RCA's argument that a significant relationship with traditional maritime activity was lacking because the component part was not uniquely maritime. *Id.*, at 321. We held that the fact that the parts were also used in land-based electrical equipment was insufficient reason to deny admiralty jurisdiction where

the defective part had caused damage to a marine vessel in navigable waters. *Id.*

*Sperry Rand* does not preclude all consideration of the maritime nature of a product; rather, it holds that lack of a uniquely maritime character may not be dispositive of the jurisdictional question. In *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132 (5th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981), the maritime nature of the instrumentalities was considered as a part of the four-factor *Kelly* analysis. *Sohyde* involved claims for property damage arising from a blowout of a high pressure gas well which occurred during workover operations on the well aboard a submersible drilling barge. This court found it relevant to the nexus analysis that the instrumentalities involved were essentially the same as those involved in a land-based workover operation. *Id.*, at 1137. This fact counseled against invoking admiralty jurisdiction over the claims.

The fact that asbestos insulation is not peculiar to maritime activities suggests that this dispute may not be within admiralty jurisdiction.

(3) *Causation and type of injury*

In *Sohyde* we found relevant to the jurisdictional analysis that all of the causative factors could have as easily occurred on land and that the injury and damages were indistinguishable from those arising from land-based well blowouts. *Sohyde*, 644 F.2d at 1137–8. Similarly, in the cases before us, both the injuries and their cause are identical to the asbestos-related injuries affecting thousands of land-based workers who have no relationship to maritime activity. In addition, the type of injury involved here bears little if any relationship to maritime navigation or commerce. Our decisions giving a maritime character to land-based tort claims do not involve industrial diseases found in land-based workers; rather, the injuries in those cases were of uniquely maritime character such as ship collision or sinking while actually underway on navigable waters. *See Sperry*

*Rand Corp. v. Radio Corp. of America*, 618 F.2d 319, 321 (5th Cir.1980) (claim that components in a marine steering mechanism were defectively made and caused vessel to be grounded and be involved in collision sufficient to invoke admiralty jurisdiction); *Jig The Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 174 (5th Cir.1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (claim that negligent construction or defective design of ocean-going shrimpboat caused vessel to sink on the high seas is governed by maritime law); *In Re Motor Ship Pacific Carrier*, 489 F.2d 152, 156 (5th Cir.), *cert. denied*, 417 U.S. 931, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974) (where blinding smoke and gasses emitted by land-based paper mill caused vessel in navigation to collide with a railroad bridge spanning the waterway, action against paper mill stated claim in admiralty). In all three of the cited cases the maritime nature of the injury was considered extremely important in assuming admiralty jurisdiction over the actions against the land-based defendants. The non-maritime nature of the appellants' injuries constitute yet another factor to be weighed against application of maritime law.

(4) *Traditional concepts of the role of admiralty law*

"The Constitution's framers and Congress endowed the federal courts with jurisdiction over maritime disputes in order to advance specific federal interests; application of uniform federal maritime law is unjustified where those interests are not implicated." *Harville*, 731 F.2d at 785. In *Executive Jet* the Supreme Court enunciated the matters with which admiralty has traditionally been concerned:

That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catas-

trophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.

*Executive Jet,* 409 U.S. at 270, 93 S.Ct. at 505. Appellants have not demonstrated that their claims are encompassed by these concerns.

■ ˙ The overriding concern of the maritime law is the federal interest in the need for a uniform development of the law governing the maritime industries. *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 677, 102 S.Ct. 2654, 2660, 73 L.Ed.2d 300 (1982). We do not believe this interest would be furthered by assuming admiralty jurisdiction over these claims. The traditional concerns of admiralty law do not implicate any interest in uniform resolution of the claims of land-based workers exposed to asbestos while aboard vessels. Appellants are not seamen; rather they are land-based workers whose work and injuries are identical to those of asbestos workers who have never stepped foot aboard a vessel. We also find that there is no unique federal interest in uniform treatment of asbestos claims. We agree with the Eleventh Circuit that:

> The federal government may or may not have an interest in maintaining uniform rules for resolving asbestos injury claims, but such an interest would be for Congress, not this Court to articulate. Moreover, if the federal government had such an interest, we would hardly advance it by applying federal substantive law in the small percentage of asbestos cases involving shipyard workers; "for this Court to uphold federal admiralty jurisdiction in a few wholly fortuitous [asbestos] cases would be a most quixotic way of approaching that goal." *Executive Jet,* 409 U.S. at 273–74, 93 S.Ct. at 507.

*Harville,* 731 F.2d at 786. This Court has rejected the argument that the problems of asbestos exposure involve uniquely federal concerns justifying the displacement of state law. *Jackson v. Johns-Manville Sales Corp.,* 750 F.2d 1314 (5th Cir.1985) (*en banc*). In *Jackson,* the defendants, manufacturers of asbestos products, urged this Court to develop federal common law to govern the issues of recoverable damages in asbestos litigation. Over a strong dissent, the *en banc* court rejected this plea, finding that:

> this case is not an appropriate one for the creation of a federal common law because of the absence of a uniquely federal interest and the practical problems that would attend the displacement of state law. Although federal common law may at times be a "necessary expedient," under our federal system Congress is generally the body responsible for balancing competing interests and setting national policy. There is no doubt that a desperate need exists for federal legislation in the field of asbestos litigation. Congress' silence on the matter, however, hardly authorizes the federal judiciary to assume for itself the responsibility for formulating what essentially are legislative solutions. Displacement of state law is primarily a decision for Congress, and Congress has yet to act.

*Id.,* at 1327 (citations omitted). Admiralty's concern for uniformity is not implicated by appellants' claims.

We recently recognized that the cases considering claims such as those before us—*Austin, Keene, Owens,* and *Harville* —"all involve the delicate question whether the federal interest in an amphibious worker's personal injury claims is sufficiently strong to justify federal courts supplanting state law with the federal common law of admiralty." *Hall v. Hvide Hull No. 3,* 746 F.2d 294, 302 n. 16 (5th Cir.1984). In determining whether to expand admiralty jurisdiction, we are told to "proceed with caution." *Executive Jet,* 409 U.S. at 272, 93 S.Ct. at 506. Since exercise of admiralty jurisdiction may preempt state regulation of matters traditionally committed to local resolution, courts are to interpret congres-

649

sional grants of admiralty jurisdiction restrictively.

The power reserved to the states, under the Constitution, to provide for the determination of controversies in their courts may be restricted only by the action of Congress in conformity to the judiciary sections of the Constitution.... Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which [a federal] statute had defined.

*Executive Jet,* 409 U.S. at 272–273, 93 S.Ct. at 506–507, *quoting, Victory Carriers, Inc. v. Law,* 404 U.S. 202, 212, 92 S.Ct. 418, 425, 30 L.Ed.2d 383 (1971).

The state interest in providing uniform treatment to similarly situated asbestos workers is great. The risks encountered by appellants differ little, if at all, from the risks encountered by construction workers whose entire careers were spent installing or repairing asbestos products on land. These similarly situated workers cannot avail themselves of the special rules of admiralty law and are confined to state law remedies and are bound by the state law statutes of limitation. The appellants' claims are identical to those of thousands of other plaintiffs and involve questions of tort law traditionally committed to resolution under state law. Resolution of these claims does not require the expertise of an admiralty court as to navigation or water-based commerce. The fortuitous circumstance that appellants were periodically assigned to shipyards is insufficient to overcome this state interest, especially where appellants' work aboard vessels was the work of skilled land-based tradesmen, not the work of seamen.

The traditional concepts of the role of admiralty law and the demands of federalism provide yet another reason for declining to exercise admiralty jurisdiction over appellants' claims.

CONCLUSION

■ Analysis of each of the *Kelly* factors suggests that the wrongs alleged by appellants do not bear a significant relationship to traditional maritime activity. We hold that the tort claims of land-based insulators against the manufacturers and distributors of asbestos products do not invoke the federal court's admiralty jurisdiction. AFFIRMED.