NICHE OILFIELD SERVICES, LLC, Appellant,

v.

John CARTER, Jr., Appellee.

No. 14–09–00433–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 10, 2011.

---

Thomas C. Wright, Jessica A. Zavadill, Mary Szilagyi Ovaitt, R. Russell Hollenbeck, Houston, for Appellant.

Cory Daniel Itkin, Jason A. Itkin, Kevin Dubose, Houston, for Appellee.

Panel consists of Chief Justice HEDGES and Justice BOYCE.

## OPINION

WILLIAM J. BOYCE, Justice.

Niche Oilfield Services, LLC appeals from a judgment in favor of John Carter, Jr. in connection with a negligence action based on injuries Carter sustained while cleaning a vessel in navigable waters. We affirm the trial court's judgment.

### Background

This appeal arises from an incident that occurred on March 13, 2006 while Carter was removing residue from a dry bulk tank on the supply vessel M/V PILOT TIDE in navigable waters. At the time of the incident, Carter was working inside the tank using a powerful vacuum hose connected to a three-axle truck parked on a dock adjacent to the vessel.

The M/V PILOT TIDE was owned and operated by Tidewater Marine, LLC, which hired Southern Tank Specialists to clean it. Southern Tank employed Carter as part of its five-man cleaning crew. Southern Tank hired Niche to provide a vacuum truck called a "Gap–Vac" for use in cleaning the vessel. Niche employed the Gap–Vac's driver and operator, Jerry Dickens.

The dry bulk tank was approximately 12 feet deep and was situated below the vessel's main deck. It was fitted with a floor-to-ceiling internal ladder accessible by a 24–inch manhole on the deck.

Dickens parked the Gap–Vac on the dock about 25 to 50 feet away from the vessel with the back of the truck facing the vessel. A vacuum hose ran from the back of the truck up and over the vessel's side rail, across the deck, and through the manhole down into the tank where Carter was working. Dickens operated the Gap–Vac from a control panel located next to a shutoff valve on the back of the truck.

Loud noise generated by the Gap–Vac precluded verbal communication with Dickens and necessitated hand signals. From his lower position on the dock, Dickens could not see over the rail to observe the tank or the manhole; accordingly, two Southern Tank employees were positioned to relay hand signals to Dickens. One Southern Tank employee was designated as the "hole watch" stationed next to the manhole. A second Southern Tank employee, Jamie Andrews, was designated as the "rail watch" stationed at the vessel's side where Dickens could see him from the dock.

The incident occurred after rain began falling during the cleaning operation. To prevent rain from entering the tank where Carter was working, a tarp was draped over three five-gallon buckets placed around the manhole. The tarp was sucked into the manhole while Carter was using the Gap–Vac's vacuum hose at the bottom

of the tank; the tarp cut off Carter's air supply as the vacuum simultaneously sucked oxygen from the tank.

Carter became aware of the problem when he began having difficulty breathing and his ears started to pop. After looking up and seeing that the tarp had been sucked into the manhole, Carter climbed up the ladder and attempted without success to break the seal by pushing on the tarp. He climbed down, climbed back up, and tried without success to cut a hole in the tarp. Carter climbed back down the ladder to the bottom of the tank and then passed out while attempting to climb up the ladder a third time. He regained consciousness while lying at the bottom of the tank. By that time the suction had been released and the Southern Tank crew was removing the tarp. Carter subsequently underwent surgery and received other medical treatment for injuries he attributed to falling from the ladder inside the tank.

Carter sued Tidewater and Niche in July 2007, asserting that they acted negligently and that the vessel was unseaworthy. In his first amended petition, Carter asserted that "[t]his claim is maintained under the common law of Texas and/or the general maritime law of the United States." Carter settled his claims against Tidewater before trial.

At trial, Carter contended that Niche acted negligently and proximately caused his injuries because (1) the Gap–Vac lacked a remote shutoff and a vacuum breaker; (2) Niche failed to train Dickens adequately; and (3) Dickens left his post at the back of the truck while Carter was working in the tank, which meant that Dickens was not in position to receive a signal from the rail watch and shut off the Gap–Vac immediately when trouble arose.

Evidence regarding Dickens's whereabouts during the incident was disputed at trial. Dickens testified that he was standing at the back of the truck near the vacuum shut-off while Carter was working in the tank. He testified that no one signaled to him on the day of the incident or otherwise informed him that there was a problem. Other testimony indicated that Dickens was not standing by the controls at the back of the Gap–Vac while Carter was working in the tank; therefore, he was unable to see or act on the rail watch's shut-off signal when the tarp was sucked into the manhole. In this version of events, Dickens's absence from his post prolonged the emergency until Lawson Midkiff, a Southern Tank supervisor, released the suction by cutting the vacuum hose with a knife.

In Question No. 1, the jury was asked whether Carter's injury was proximately caused by the negligence of Carter, Niche, Tidewater, and/or Southern Tank. The jury answered "no" as to Carter and "yes" as to the other entities. In answer to Question No. 2, the jury attributed 80 percent of the injury-causing negligence to Niche, 15 percent to Southern Tank, and the remainder to Tidewater. The jury awarded $810,000 in damages encompassing awards for past and future medical care, pain and mental anguish, lost earning capacity, and physical impairment.

The trial court signed a final judgment on February 27, 2009, in which it concluded that (1) Carter's claims are governed by general maritime law; (2) Niche is jointly and severally liable under general maritime law; and (3) Niche is entitled to a five percent reduction in the damage award under general maritime law based on the pretrial settlement and the jury's apportionment of liability to Tidewater.

In conformity with these conclusions, the trial court's final judgment awards damages of $769,500 in favor of Carter and

against Niche, along with costs of court. Niche timely appealed.

### Analysis

Niche raises four issues on appeal. First, it contends that the only evidence proffered to establish Dickens's absence from his post is inadmissible hearsay; therefore, Niche argues that the evidence is legally and factually insufficient to support the jury's "yes" answer as to Niche in Question No. 1 and its apportionment of responsibility to Niche in Question No. 2. Second, Niche contends that Carter's alternative negligence theories cannot support the jury's answers or the trial court's judgment. Third, Niche contends that a new trial is warranted based on the cumulative effect of the erroneous admission of hearsay statements. Fourth, Niche contends that the trial court erroneously computed the settlement credit to which Niche is entitled by applying maritime law instead of Texas law.

### I. Standard and Scope of Review

#### A. Legal and Factual Sufficiency of the Evidence

Legal insufficiency challenges may be sustained only when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005) (citing Robert W. Calvert, *"No Evidence"* and *"Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960)).

We must consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would sup-

port it. *Id.* at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard that evidence. *Id.* "The traditional scope of review does not disregard contrary evidence in every no evidence review if there is no favorable evidence (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above)." *Id.* at 810–11. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* at 822. Accordingly, the ultimate test for legal sufficiency always must focus on whether the evidence would enable reasonable and fair-minded jurors to reach the verdict under review. *Id.* at 827. Legal sufficiency review in the proper light must credit favorable evidence if reasonable jurors could do so, and must disregard contrary evidence unless reasonable jurors could not do so. *Id.* The reviewing court cannot substitute its judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822.

In reviewing factual sufficiency, we must consider and weigh all the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.*

#### B. Admission of Evidence

■ A trial court's admission or exclusion of evidence is reviewed for abuse of discretion. *See, e.g., In re J.P.B.*, 180 S.W.3d 570, 575 (Tex.2005). Reversal based on the erroneous admission of evidence is warranted only if a review of the entire record demonstrates that the error

probably caused the rendition of an improper judgment. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *see* Tex.R.App. P. 44.1.

## II. Sufficiency and Admissibility of Evidence Pertaining to Negligence

■ We begin with Niche's first issue challenging the sufficiency of the evidence to support the jury's negligence finding and its apportionment of comparative responsibility. We also address Niche's third issue asserting that a new trial is warranted based upon cumulative errors arising from the trial court's admission of hearsay testimony concerning Dickens's whereabouts during the incident. Niche's arguments on appeal warrant a detailed discussion of the evidence adduced at trial.

Carter predicated his negligence claim against Niche in significant part on a contention that Dickens left his post at the back of the Gap–Vac near the controls while Carter was using the vacuum to remove debris in the dry bulk tank. According to Carter's theory of the case, this departure violated the applicable standard of care and proximately caused his injuries because Dickens was not standing by the controls to receive a signal and immediately shut the vacuum off when trouble arose in the tank.

For his part, Dickens testified at trial that he was standing at the back of the truck near the vacuum shut-off so that he could see Jamie Andrews, the rail watch, while Carter was working in the tank. Dickens testified that no one signaled to him on the day of the incident or otherwise informed him that there was a problem while Carter was working in the tank. Dickens denied leaving his post and denied going to the truck cab. Dickens also denied receiving any complaints after the incident about having left his post. He testified that he was unaware of any problem in the tank when he left the job site on

March 13. Andrews, the rail watch, did not testify.

Carter testified without objection on direct examination as follows:

Q. As they're pulling [the tarp] ... off, they're helping you get out of the tank?

A. Yes, sir.

Q. Who was up there?

A. Lawson Midkiff, Jamie Andrews, and Juan and Rydell Palmer.

Q. What was Mr. Midkiff doing?

A. He was hollering and cussing. And he was fussing about he couldn't believe that Gap–Vac driver wasn't at his post.

Niche elicited similar testimony from Carter during cross-examination. Carter answered "Yes, ma'am" to a question during cross-examination asking, "Did you ever talk to anybody that didn't see [Dickens] ... at his post?" In response to a follow-up question asking "Who is that?" Carter answered: "Lawson Midkiff." Niche emphasizes that Carter could not see what was happening on deck or on the dock because he was working inside the tank when the incident occurred.

Wayne LaSalle, who is Carter's older brother and fellow Southern Tank employee, also testified without objection regarding Dickens's whereabouts:

A. From what they told me the Gap–Vac hose sucked the tarp down, and they couldn't locate the Gap–Vac driver to knock it out of gear.

\* \* \*

Q. Now, who is it—when you get a contractor to bring a Gap–Vac truck out, who is it that's actually running the Gap–Vac truck?

A. The Gap–Vac driver.

Q. And in the experience you've had, what does the Gap–Vac truck driver—

what does he do? What is he responsible for?

A. He's responsible to stay at the back of the truck and operate it at all times.

Q. And you said at least in your part in filling out the accident report in this case, it's your understanding that the Gap–Vac truck driver didn't stay in place?

A. That's correct.

Niche stresses that Wayne LaSalle lacked personal knowledge because he was not on the vessel when the incident occurred and learned about it afterwards.

Relying on *Kerlin v. Arias,* 274 S.W.3d 666, 668 (Tex.2008), Niche argues that this hearsay-based testimony from Carter and Wayne LaSalle lacks probative value. Niche misplaces its reliance on *Kerlin.*

■ The summary judgment movant in *Kerlin* objected on hearsay grounds to an affidavit proffered by the non-movant; the Texas Supreme Court agreed that statements in the affidavit relying on out-of-court sources were "hearsay and carrie[d] no probative weight over Kerlin's objection." *Id.* at 667–68. Here, Niche did not object to the testimony set forth above. Unobjected-to hearsay properly may be considered in analyzing the sufficiency of the evidence supporting a jury verdict. *See City of Keller,* 168 S.W.3d at 812 n. 29; *In re E.A.K.,* 192 S.W.3d 133, 151 (Tex. App.-Houston [14th Dist.] 2006, pet. denied); *see also* Tex.R. Evid. 802. Therefore, we consider this testimony from Carter and Wayne LaSalle in conjunction with Niche's sufficiency challenges.

In addition to the testimony set forth above, Southern Tank's regional manager Marvin LaSalle also discussed Dickens's whereabouts while Carter was working in the vessel's dry bulk tank. Marvin LaSalle was not present on the vessel when the incident occurred; he helped Carter fill out an accident report afterwards. Marvin LaSalle testified as follows on direct examination:

Q. Tell us generally what was your understanding of what had happened?

A. The weather had got bad, and they told—

[NICHE'S COUNSEL]: That's hearsay. He wasn't here to see what happened and to hear what happened. There's plenty of witnesses to testify what happened.

[CARTER'S COUNSEL]: I'm not offering this for the truth of the matter asserted. I want to get some context. He was part of filling out an accident report on this. I'm not offering this for the truth of the matter asserted.

THE COURT: Overrule the objection.

No running objection to hearsay was requested. Marvin LaSalle then described his understanding that (1) a tarp had been placed over the hole "to keep the weather out," but it was "sucked down into the hole;" and (2) "by the time they got the suction off the hose and stuff, the damage had been done." He also testified that "no direct rule or regulation" governs the height at which a tarp must be placed. This portion of Marvin LaSalle's testimony did not discuss whether Dickens was present at his post while Carter was working in the vessel's dry bulk tank.

Marvin LaSalle's testimony continued as follows:

Q. After you got this report from Mr. Midkiff about what had happened, what did you do next?

A. I wasn't available to go to the job, so the next, I think, it was a couple of days before I could get to them. And I invited them over to my residence where my little portable office was. And we did a report of what happened.

Q. Did you assist with filling out that report?

A. Yes.

Q. Who all was present when the report was filled out?

A. Wayne LaSalle, John Carter, Alfred Harrison, Lawson Midkiff. And I can't remember Rydell's last name, but we called him "Ski Boy." I don't have any record of that.

Q. And what information—tell us: What was ultimately reported in the accident report?

A. The accident report would cover—

[NICHE'S COUNSEL:] Objection, I object. If there's an accident report, we need to see the accident report rather than what was reportedly in it.

[CARTER'S COUNSEL:] Your honor, the issues that we have here, the Southern Tank records have been subpoenaed. The form was not included with what was actually produced by Southern Tank. There are several people who are going to testify that they were there. As far as filling out this report, this is the only evidence we have of it. We don't have the actual documents.

THE COURT: Overrule the objection.

Q. . . . Mr. LaSalle, if you would, would you tell us, as best as you can recall, what was included in the document that y'all completed.

A. It starts off with the setup, and it starts—then it becomes your witness. Each witness makes a statement of what, you know, they actually saw on the job. And it would, in turn, entitles everyone whether they were at their positions at the time of the accident, what took so long for the power of the truck to be cut off to prolong whatever incident happened at the accident.

Q. Okay. There are two issues you mentioned specifically that I want to ask

you about. One of those is whether everybody was in place as they should have been. Can you tell us, based on your memory, what was actually reported in the accident report?

A. You're testing my memory. The accident report basically stated that the hole watch relayed to the rail watchman to relay to the truck to cut his power off. And the truck driver was not at his controls, and they couldn't reach him until someone ran off the boat to go and get him and found him in the cab of the truck. And the supervisor on the job—which he wasn't supposed to have—reached in his pocket and got a knife and I think as a last resort—cut the hoses to cut the power off, cut the suction off.

Niche attacks the last answer as "hearsay within hearsay." But Niche did not object to the last answer on that basis at trial, and it did not request a running objection to hearsay contained in the accident report.

At most, Niche lodged what reasonably could be construed as an objection under Texas Rule of Evidence 1002 during this portion of Marvin LaSalle's testimony discussing the accident report and Dickens's whereabouts. Niche does not challenge the admissibility of this testimony under Rule 1002 on appeal.

Additionally, Niche elicited similar testimony from Marvin LaSalle on cross-examination:

Q. So they first recognized that there was a problem with the tarp and it took 20 to 30 minutes before they cut the suction off?

A. Before they could get it cut off. They went through their line of training, which was the hole watch to wall monitor to the truck driver. The truck driver, everybody was in position but him. So somebody ran to try to get a hold of

him. And they found him inside the truck. By that time the supervisor decided to pull his knife out and cut the hose.

We consider the unobjected-to hearsay and hearsay elicited via cross-examination of Marvin LaSalle in assessing Niche's sufficiency challenge. *See* Tex.R. Evid. 802; *City of Keller,* 168 S.W.3d at 812 n. 29; *In re E.A.K.,* 192 S.W.3d at 151.

Expert testimony also addressed Dickens's location during the incident. Carter's expert safety engineer Jack Madeley testified on direct as follows:

> A. ... Meanwhile on the top [,] the hole watch, the rail watch, Mr. Midkiff see what's happening; and they immediately try and go to pull the vacuum or pull the tarp, meanwhile signaling for the operator to shut the truck down. Well, he's not there. The operator is nowhere to be seen. And they're yelling and screaming for the operator to shut it off. He can't hear them, so they're still trying to get the tarp off....
>
>     *   *   *
>
> Q. Okay. And, sir, based on all the information that you reviewed, is there anything to indicate to you that, in fact, that this driver was in proper position?
>
> A. There's testimony of and there's a number of statements from some of the witnesses that he was not at the back of the truck. They did not see where he was. Apparently he was in the cab of the truck, not paying attention because they had been signaling; and he was not responding to their signaling at all.

During cross-examination by Niche, Madeley testified as follows:

> Q. Are you telling this Court that you believe that the Niche employee who was 200 feet or 200 yards away from the hole had more responsibility for the safety of Mr. Carter [than] he had for

himself or that Southern Tank had for him?

> A. Not more responsible for the safety of; but I think with respect to the causation of the accident, is substantially more involved in the causation because Southern Tank had undertaken precautions. They had the hole watch. They had people standing there. They had people there ready to rescue. And the only person that disappeared, that we have testimony disappeared from his job, was the Niche employee.

Madeley returned to the issue of Dickens's whereabouts during redirect:

> Q. With some of the questions Opposing Counsel asked you, you were using the term "responsible for a safe work environment" and I think eventually you started to use the term "responsible." Sir, it would be true in this case that everyone involved, all the companies, Southern Tank, Tidewater, Niche, those companies would all have responsibility for providing a safe work environment; is that right.
>
> A. Sure.
>
> Q. Now, how is that different than actually having some causal responsibility [for what] happened to Mr. Carter?
>
> A. Well, there you take a look at what the events were, either things that happened or did.not happen that ended up causing the particular events; and in this case when the tarp got sucked down, you had a missing operator that could not shut the thing off.
>
> Q. And, sir, we've talked about everyone having responsibility for a safe work environment; but with regard to the accident, in your opinion who has overwhelming responsibility for the accident that happened to Mr. Carter?

A. That would be Niche because it's their operator who disappeared from his post.

\*     \*     \*

Q. And sir, you've reviewed the testimony of Mr. Carter. You've reviewed statements from every member of the Southern Tank crew that was present there. Based on that information that you reviewed, is it clear to you that the driver from the Niche truck actually left his post?

A. Yes.

Niche does not contend on appeal that Madeley's expert testimony is inadmissible. Instead, Niche contends that Madeley's testimony regarding Dickens's whereabouts is conclusory, speculative, and "not evidence of what actually happened" because his knowledge and opinions were based on hearsay statements from Southern Tank employees "who did not personally see whether Dickens was or was not where he said he was."

█ Niche acknowledges that an expert can testify at trial in appropriate circumstances about hearsay evidence relied upon in forming an expert opinion if such evidence reasonably would be relied upon by experts in the field in forming opinions or inferences regarding the subject at issue. See, e.g., Sosa by and through Grant v. Koshy, 961 S.W.2d 420, 426–27 (Tex.App.-Houston [1st Dist.] 1997, pet. denied) (citing Tex.R. Evid. 703, 705).[1] Niche nonetheless argues that Madeley's recounting of the hearsay he relied upon concerning Dickens's whereabouts merits no weight in analyzing the sufficiency of the evidence to support the jury's answers to specific questions in the charge.

Niche's safety expert, Joseph Kocurek, also testified about hearsay statements regarding Dickens's whereabouts made by Andrews, the rail watch, and Midkiff, the supervisor. Kocurek did so when he complied with a request by Carter's counsel to read along with the text of unsworn recorded statements by Andrews and Midkiff. Carter's counsel did not offer the unsworn recorded statements into evidence, and he expressly disclaimed any intent to offer these statements for the truth of the matters asserted therein. The trial court overruled Niche's objections that the statements were inadmissible hearsay, and that it was improper to present these inadmissible hearsay statements to the jury in this manner.

In the course of these "read-alongs," Kocurek recounted statements by Andrews and Midkiff to the effect that Dickens was not present at his position at the Gap–Vac's controls when the incident occurred. On appeal, Niche contends that the hearsay statements from Andrews and Midkiff recounted in Kocurek's "read-alongs" carry no weight for sufficiency purposes because Carter's counsel specifically disclaimed any intent to proffer this evidence for the truth of the matter asserted therein concerning Dickens's whereabouts.

We now turn to the specific challenges presented in Niche's first and third issues on appeal.

We reject Niche's contention in its first issue that legally insufficient evidence supports the jury's "yes" answer as to Niche's negligence in response to Question 1 and its apportionment of comparative responsibility in response to Question 2. Hearsay evidence tending to establish that Dickens left his post was admitted repeatedly with-

---

1. Expert testimony recounting hearsay that was relied upon in forming an expert opinion is subject to an objection that the risk of unfair prejudice substantially outweighs the probative value of such testimony. See Sosa, 961 S.W.2d at 427 (citing Tex. R. Evid. 403).

out objection during the testimony of Carter, Wayne LaSalle, and Marvin LaSalle. Niche also elicited testimony to this effect during its cross-examination of Carter and Marvin LaSalle. This evidence amounts to much more than a scintilla; this case does not involve a complete absence of evidence that Dickens left his post. Furthermore, as discussed above, this court is not barred by rules of evidence from considering unobjected-to hearsay evidence offered via Carter, Wayne LaSalle, and Marvin LaSalle to establish that Dickens left his post. *See City of Keller,* 168 S.W.3d at 810, 812 n. 29; *see also* Tex.R. Evid. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

Dickens testified that he did not leave his post, but his testimony does not conclusively establish this fact. The jury was entitled to weigh Dickens's testimony that he remained near the Gap–Vac controls against testimony from Carter, Wayne LaSalle, and Marvin LaSalle indicating that Dickens left his post. In so doing, reasonable and fair-minded jurors could answer "yes" as to Niche in response to Question 1 and apportion 80 percent of the injury-causing negligence to Niche in response to Question 2 based upon evidence that Dickens was (1) absent from his post at the Gap–Vac controls when the incident occurred, and thus (2) unable to receive signals and shut off the vacuum immediately when signaled to do so after the tarp was sucked into the manhole. *See id.* at 822, 827. Therefore, we conclude that these answers are supported by legally sufficient evidence. We likewise reject Niche's contention that this evidence is so weak and the answers to Question No. 1 and Question No. 2 are so against the great weight and preponderance of the evidence as to make the jury's verdict clearly wrong and manifestly unjust. *Golden Eagle Archery, Inc.,* 116 S.W.3d at 761.

Because testimony from Carter, Wayne LaSalle, and Marvin LaSalle constitutes legally and factually sufficient evidence to support the jury's answers to Question No. 1 and Question No. 2, we do not address whether additional hearsay testimony from safety experts Madeley and Kocurek concerning Dickens's absence from his post— proffered in the format of "read alongs" or otherwise—should be given weight for purposes of a sufficiency review. We also do not address Niche's second issue on appeal, which focuses on whether the jury's verdict can be affirmed based on alternative theories of negligence distinct from Carter's contention that Dickens was absent from his post during the incident.

■ Based on the testimony discussed at length above from Carter, Wayne LaSalle, and Marvin LaSalle, we reject Niche's third issue and its argument predicated on cumulative error from the admission of hearsay evidence. The trial court's admission of unobjected-to hearsay from Carter, Wayne LaSalle, and Marvin LaSalle concerning Dickens's whereabouts was not erroneous. Niche does not challenge the admissibility of Madeley's expert testimony referencing Dickens's whereabouts. Assuming for argument's sake that the "read alongs" with Kocurek were error, any inadmissible hearsay introduced in the course of those "read alongs" was cumulative of other evidence regarding Dickens's whereabouts that was introduced elsewhere during trial. Additionally, we note that Carter's counsel did not expressly refer to Kocurek during closing and did not emphasize the "read-alongs" during closing. Niche cannot establish harmful error on this record. *See, e.g., GTE Sw., Inc. v. Bruce,* 998 S.W.2d 605, 620 (Tex.1999) (erroneous admission of expert testimony was harmless error because testimony was cumulative of other testimo-

ny); *see also* Tex.R.App. P. 44.1; *Air Prods. & Chem., Inc. v. Odfjell Seachem A/S,* 305 S.W.3d 87, 96–99 (Tex.App.-Houston [1st Dist.] 2009, no pet.).

We overrule Niche's first, second, and third issues.

### III. Application of Maritime Law

Niche's last issue presents a legal question regarding the applicability of general maritime law.

The trial court denied Niche's request to apply a dollar-for-dollar credit under Texas law based on Tidewater's pre-trial settlement. *See* Tex. Civ. Prac. & Rem.Code Ann. § 33.012(b) (Vernon 2008). Instead, the trial court applied general maritime law and reduced the jury's damage award against Niche by five percent based on the jury's apportionment of liability to Tidewater. *See McDermott, Inc. v. AmClyde,* 511 U.S. 202, 217–21, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). Niche contends that the trial court erred by applying general maritime law and refusing to apply a dollar-for-dollar credit under Texas law.

■■ Article III, Section 2 of the United States Constitution confers subject matter jurisdiction over admiralty and maritime causes of action upon federal courts. U.S. Const. art. III, § 2, cl. 1. Congress likewise has conferred "original jurisdiction ... of ... any civil case of admiralty or maritime jurisdiction" upon federal district courts. 28 U.S.C. § 1333(1). Under section 1333(1)'s "saving to suitors" clause, state courts also can entertain *in personam* maritime causes of action. *Texaco Ref. & Mktg., Inc. v. Estate of Dau Van Tran,* 808 S.W.2d 61, 64 (Tex.1991) (citing 28 U.S.C. § 1333(1)). When they do so, the " 'substantive remedies afforded by States [must] conform to governing federal maritime standards.' " *Id.* (quoting *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 223, 106 S.Ct. 2485,

91 L.Ed.2d 174 (1986)). If an action is capable of being heard and determined in admiralty, then federal general maritime law applies regardless of whether the action is brought in federal or state court. *Seven Seas Fish Mkt., Inc. v. Koch Gathering Sys., Inc.,* 36 S.W.3d 683, 686 (Tex. App.-Corpus Christi 2001, pet. denied).

■■ Courts apply a two-prong test to determine whether a tort claim falls within admiralty jurisdiction and thus is governed by general maritime law. One prong focuses on location; the other focuses on connection to maritime activity. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock, Co.,* 513 U.S. 527, 534, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995); *see also Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Marine Transp. Corp. v. Methodist Hosp.,* 221 S.W.3d 138, 145 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *Seven Seas Fish Mkt., Inc.,* 36 S.W.3d at 686.

■■ Under the location prong, a court must determine whether a tort occurred on navigable waters or whether an injury suffered on land was caused by a vessel on navigable waters. *Grubart,* 513 U.S. at 534, 115 S.Ct. 1043; *Marine Transp. Corp.,* 221 S.W.3d at 145; *Seven Seas Fish Mkt., Inc.,* 36 S.W.3d at 686.

■■ The maritime nexus prong involves two inquiries. *Grubart,* 513 U.S. at 534, 115 S.Ct. 1043. First, a court must assess whether the general features of the incident have a potentially disruptive impact on maritime commerce. *Id.* This inquiry evaluates potential disruption rather than actual disruption. *Sisson v. Ruby,* 497 U.S. 358, 363, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). Second, a court must assess whether the general character of the activity giving rise to the incident shows a substantial relationship to tradi-

tional maritime activity. *Grubart*, 513 U.S. at 534, 115 S.Ct. 1043; *see also Sisson*, 497 U.S. at 364–65, 110 S.Ct. 2892. The key to this latter inquiry is "whether a tortfeasor's activity, commercial or non-commercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Grubart*, 513 U.S. at 539–40, 115 S.Ct. 1043.

## A. Waiver

■ As a threshold matter, we reject Niche's contention that Carter waived application of maritime law because he "did not sufficiently invoke maritime law with respect to his claims against Niche...."

Carter pleaded as follows in Plaintiff's First Amended Petition: "This claim is maintained under the common law of Texas and/or the general maritime law of the United States." The Clerk's Record provides no indication that Niche challenged the adequacy or specificity of this allegation via special exceptions. Carter's counsel stated as follows at the beginning of the charge conference: "[W]e have pled under both the Texas common law and under general maritime law. We maintain that the case would be governed by maritime law even though the Defendant in this case was onshore." Carter's counsel reiterated his position that general maritime law applied in the course of discussing proper formulation of the jury charge.

This record demonstrates that Carter sufficiently invoked maritime law in the trial court.

## B. Maritime Location

■ The maritime location prong is satisfied here because the tort at issue occurred on navigable waters. A tort occurs for these purposes where the negligence takes effect—not where the negli-

gent acts or omissions are committed. *Exec. Jet*, 409 U.S. at 266, 93 S.Ct. 493 (citing *The Plymouth*, 3 Wall. 20, 35, 36, 18 L.Ed. 125 (1866), and *Smith & Son v. Taylor*, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928)). Niche's dockside negligence in operating the Gap–Vac took effect on navigable waters because that negligence proximately caused Carter's injuries while he was working on the M/V PILOT TIDE in navigable waters. *See Marine Transp. Corp.*, 221 S.W.3d at 145 (" 'Thus, where a force giving rise to an injury on the waters originates on land, the tort is maritime.' ") (quoting *Hails v. Atl. Richfield Co.*, 595 F.Supp. 948, 950 (W.D.La. 1984)).

## C. Substantial Connection

### 1. Potential disruption

■ We turn next to the potential disruption inquiry, which involves an assessment of " 'the general features of the type of incident involved' ... to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' " *Grubart*, 513 U.S. at 534, 115 S.Ct. 1043 (quoting *Sisson*, 497 U.S. at 363 & 364 n. 2, 110 S.Ct. 2892). Here, the "general features of the type of incident" encompass an injury to a worker while maintaining a vessel in navigable waters. "Without a doubt, worker injuries, particularly those involved in repair and maintenance, can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel." *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir.1995) (en banc). Therefore, this inquiry points to the application of general maritime law.

### 2. Substantial relationship to traditional maritime activity

■ The final inquiry involves an assessment of "whether the 'general char-

acter' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Grubart*, 513 U.S. at 534, 115 S.Ct. 1043 (quoting *Sisson*, 497 U.S. at 365, 364 & n. 2, 110 S.Ct. 2892). The focus here is on the tortfeasor's activity. *Id.* at 539–40, 115 S.Ct. 1043. "The relevant activity 'is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose.'" *Marine Transp. Corp.*, 221 S.W.3d at 145 (quoting *Sisson*, 497 U.S. at 364, 110 S.Ct. 2892). "This test focuses on the 'comparison of traditional maritime activity to the arguably maritime character of the tortfeasor's activity in a given case.'" *Id.* (quoting *Grubart*, 513 U.S. at 542, 115 S.Ct. 1043).

Niche contends that the substantial relationship standard is not satisfied here because "[o]perating a land-based vacuum truck has little connection with maritime navigation and commerce." We disagree with Niche's description of the relevant activity. The "general character" of the "activity giving rise to the incident" in this case is the provision of equipment for use in the cleaning and maintenance of a vessel in navigable waters. *See Poret v. La. Lift & Equip., Inc.*, No. Civ.A. 02–3642, 2003 WL 1338726, at *2 (E.D.La. March 13, 2003) ("The problem with Defendant's argument ... lies in its description of the activity.... The activity is not simply the lease of a forklift, but leasing a forklift to a stevedoring company for use in vessel loading and unloading. The unloading of a ship's cargo is a traditional maritime activity.").

Like the Fifth Circuit, we have little difficulty in concluding that "the repair and maintenance of a [vessel] ... on navigable waters is certainly a traditional maritime activity." *Coats*, 61 F.3d at 1119. Additionally, "[p]roviding compensation for shipboard injuries is a traditional function of the admiralty laws." *Id.* (citing *Sisson*, 497 U.S. at 368–75, 110 S.Ct. 2892 (Scalia, J., concurring)). Under these circumstances, "the activity giving rise to [the] ... accident has a sufficient connection to traditional maritime activity to support exercise of ... admiralty tort jurisdiction." *Id.*; *cf. Abt v. Dickson Co. of Tex.*, 251 Fed.Appx. 293, 294–95 (5th Cir.2007) (Admiralty jurisdiction did not apply to action by crane operator who was injured while moving crane along dock at a time when "there were no vessels on or near the dock;" argument for applying general maritime law "would be considerably stronger" if operator "[h]ad ... actually been servicing a vessel when this incident occurred....").[2]

We overrule Niche's fourth issue.

### Conclusion

We affirm the trial court's judgment.

YATES, J., not participating.

**2.** In arguing that general maritime law does not apply here, Niche relies heavily upon *Woessner v. Johns–Manville Sales Corp.*, 757 F.2d 634 (5th Cir.1985); Niche also invokes *Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759 (Tex.App.-Corpus Christi 1999, pet. denied), which follows *Woessner*. We note that *Woessner* applied a four-factor test for determining substantial relationship established in *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir. 1973). The Fifth Circuit subsequently has observed that the approach it employed in *Kelly* "was rejected by the Supreme Court in *Grubart*." *Coats*, 61 F.3d at 1118. Therefore, we apply the Fifth Circuit's post-*Grubart* teaching in *Coats*.