

# IN THE
# TENTH COURT OF APPEALS

## No. 10-11-00003-CV

## IN THE ESTATE OF DORIS IRENE WARD, DECEASED,

From the County Court at Law No. 1
Johnson County, Texas
Trial Court No. P200919865

## MEMORANDUM OPINION

In this will-contest case, appellant, Bobby Ward, challenges the jury's verdict that: (1) the will of his now-deceased wife, Doris Ward, is unenforceable because he exerted undue influence; and (2) Doris conveyed a seventy-seven-acre tract of land to her daughter, Dwana Phillips, several months before the will in question was executed. In five issues, Bobby complains that the evidence supporting the jury's verdict is legally and factually insufficient and that the attorney's fees award was not allowed by statute, inequitable, and unjust. We affirm.

## I. BACKGROUND

Doris and Bobby married in 1978. Both had children from previous marriages, but they did not have children together. The Wards lived in a house constructed on

4.44 acres that was conveyed to them by Doris's parents, the Dunns, in 1997. On an adjacent 2.57-acre tract of land, Dwana and her husband live in a house that apparently was updated by Doris and Bobby after the Phillipses agreed to move from Arkansas to Cleburne, Texas, to care for Doris and her father. At the time the Phillipses moved to Cleburne, Doris and her father "were in failing health."

Dwana is Doris's daughter from her first marriage and, by all accounts, was very close to Doris. The two spoke on the telephone frequently and saw each other virtually every day. Dwana actively took care of Doris to the extent that, at one point in time, Doris granted Dwana a power of attorney to make medical decisions for her.

On January 1, 2009, Doris was taken to the hospital for various medical issues. At the time, she was suffering from Parkinson's disease, had numerous problems with her back, and had lost most of the sight out of one of her eyes due to a fungal infection. Shortly thereafter, Doris was transferred to Ridgeview Rehabilitation & Skilled Nursing facility. Doris's health continued to decline, and she ultimately passed away on March 21, 2009.

On April 17, 2009, Bobby filed an application to probate Doris's will and for issuance of letters testamentary. The will Bobby sought to probate had been executed by Doris on December 11, 2008. In this will, Doris left all her real property to Bobby upon her death, including a seventy-seven-acre tract of land that Doris had inherited from her parents. The trial court probated Doris's will and, in accordance with the will, appointed Bobby as independent executor.

On June 10, 2009, Dwana filed her lawsuit, requesting a declaration from the trial court as to the rights of the parties under a purported deed and alleging that Doris's will was executed as the result of undue influence exerted by Bobby and that the will contained a mistake as to the disposition of the seventy-seven-acre tract of land commonly referred to as the family farm. Dwana asserted in the trial court that Doris had conveyed the seventy-seven-acre family farm in a deed that was delivered before Doris and Bobby went to Europe and was destroyed by someone a few days after the couple had returned from their trip.

This matter was tried to a jury, and at the conclusion of the trial, the jury determined that: (1) Doris had signed a deed to the family farm and had delivered the deed to Dwana; and (2) Bobby exerted undue influence over Doris in the execution of the December 11, 2008 will. The jury awarded Dwana $80,000 in attorney's fees for work done in the trial court, $30,000 in attorney's fees for an appeal to this Court, and $10,000 in attorney's fees for an appeal to the supreme court. On October 28, 2010, the trial court entered its final judgment adopting the jury's findings, denying Bobby's request to probate the December 11, 2008 will, and revoking the letters testamentary issued pursuant to the trial court's May 21, 2009 order. Bobby filed a motion for new trial and a motion for judgment notwithstanding the verdict. Both of these motions were denied, and this appeal followed.

## II. STANDARD OF REVIEW

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of

evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

In reviewing a factual sufficiency challenge to an adverse jury finding on which the other party had the burden of proof, we will consider all of the evidence in the record, both in support of and contrary to the finding. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We will set aside the trial court's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Where there are disputed issues of fact, we give deference to the fact-finder as they are the "sole judges of the credibility of the witnesses and the weight to be given to their testimony." *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex. 1993). In addition, "[t]he sufficiency of the evidence must be measured by the jury charge submitted when, as here, there has been no objection to it." *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005).

### III. THE JURY'S FINDING OF UNDUE INFLUENCE

In his first issue, Bobby contends that the evidence supporting the jury's conclusion that he exerted undue influence over Doris in the execution of the December

11, 2008 will is legally and factually insufficient. In his second issue, Bobby argues that the trial court erred in admitting hearsay evidence on the issue of undue influence. Specifically, Bobby complains that reports composed by nurses at the Ridgeview Rehabilitation & Skilled Nursing facility contained hearsay within hearsay and should not have been admitted into evidence.

## A. The Nurse Reports

A trial court's admission or exclusion of evidence is reviewed for abuse of discretion. *Niche Oilfield Servs., LLC v. Carter*, 331 S.W.3d 563, 569 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Ordinarily, reversal based on the erroneous admission of evidence is warranted only if a review of the entire record demonstrates that the error probably caused the rendition of an improper judgment. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *see* TEX. R. APP. P. 44.1.

Here, when the nurse reports were tendered as evidence, Bobby lodged a blanket hearsay objection. He did not specifically allege that the reports contained hearsay within hearsay, nor did he adequately explain which portions of the reports were problematic. An objection must be specific and timely and allow the trial court an opportunity to cure the alleged error, if any. *See* TEX. R. APP. P. 33.1(a); *see also Lake v. Premier Transp.*, 246 S.W.3d 167, 174 (Tex. App.—Tyler 2007, no pet.). Moreover, the objection must comport with the argument made on appeal. *See Phippen v. Deere & Co.*, 965 S.W.2d 713, 716 (Tex. App.—Texarkana 1998, no pet.). Because he made a blanket hearsay objection without identifying each part of each report that was problematic and because he did not specifically assert that the reports contained hearsay within hearsay,

Bobby's blanket objection was not sufficiently specific to preserve error. *See* TEX. R. EVID. 103(a)(1); *see also Flores v. City of Liberty*, 318 S.W.3d 551, 560 (Tex. App.—Beaumont 2010, no pet.).

And even if Bobby's blanket hearsay objection was sufficient to preserve error, the nurse reports were supported by an affidavit complying with Texas Rule of Evidence 902(10) and, thus, were admissible as business records regarding Doris's medical treatment. *See* TEX. R. EVID. 803(4), 803(6), 902(10). Based on the foregoing, we overrule Bobby's second issue.

## B. Whether Bobby exerted undue influence over Doris in the execution of the December 11, 2008 will

A person of sound mind has the right to dispose of his or her property in the manner he or she wishes. *Rothermel v. Duncan*, 369 S.W.2d 917, 923 (Tex. 1963). To establish undue influence, the Texas Supreme Court has stated that the party must show: (1) the existence and exertion of influence; (2) the effective operation of an influence so as to subvert the will or overpower the mind of the grantor at the time of the execution; and (3) the execution of an instrument the maker would not have executed but for such influence. *Id.* at 922. There must be some evidence to show that the influence was not only present, but was exerted with respect to making the instrument. *Id.*; *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied). Mere requests or efforts to execute a favorable instrument are not sufficient to establish undue influence unless the requests or efforts are so excessive so as to subvert the will of the maker. *Curry v. Curry*, 153 Tex. 421, 270 S.W.2d 208, 212 (1954).

Undue influence may be proven by circumstantial, as well as direct, evidence. *See Rothermel*, 369 S.W.2d at 922; *see also Peralez v. Peralez*, No. 13-09-00259-CV, 2010 Tex. App. LEXIS 4781, at **12-13 (Tex. App.—Corpus Christi June 24, 2010, pet. denied) (mem. op.). "More often than not, undue influence is impossible to establish by direct proof, and may only be shown by circumstances." *In re Olsson*, 344 S.W.2d 171, 173-74 (Tex. Civ. App.—El Paso 1961, writ ref'd n.r.e.). When determining a claim of undue influence, it is proper to consider all evidence of relevant matters that occurred within a reasonable time before or after the will's execution. *Watson v. Dingler*, 831 S.W.2d 834, 837 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

In the charge, the jury received the following instructions:

> You are instructed that influence is considered undue when the free agency of the person is destroyed and a document is produced that expresses the will of the one exerting the influences rather than the person's true wishes. Not every influence exerted over a person is undue. One may request or even importune and entreat another to execute a favorable dispositive instrument, but unless the importunities and entreaties are shown to be excessive as to subvert the will of the maker they will not taint the validity of the instrument with undue influence.

> . . . .

> You are instructed that undue influence occurs when:

> (1) There is the existence and exertion of an influence;
> (2) That the influence operates to subvert or overpower the person's mind when executing the document; and
> (3) That the person would not have executed the document but for the influence.

> . . . .

> In considering whether or not undue influence existed, you may consider any of the following:

1. the opportunity existing for the exertion of the type of influence or deception possessed or employed;
2. the circumstances surrounding the drafting and execution of the will[;]
3. the existence of a fraudulent motive[;]
4. whether there has been a habitual subjection of the testator to the control of another[;] and
5. whether the will executed is unnatural in terms of its disposition of property.

At trial, Bobby portrayed himself as a loving and caring husband who tended to Doris's needs, which, as he argues on appeal, precludes a finding of undue influence. He testified that Doris changed her mind frequently and that she did so without coercion. In his appellate brief, Bobby asserted that "not a single family member or friend, or anyone, was called to testify that they had ever witnessed Bobby being mean, abusive, or controlling of Doris in their over thirty years of marriage, or that Doris ever said she was afraid of Bobby." However, the record contains several examples which contradict Bobby's testimony and support the jury's finding of undue influence.

On May 6, 2009, the Texas Department of Family and Protective Services (the "Department") issued a report regarding allegations that Bobby abused or medically neglected Doris. Initially, the Department found that Bobby had medically neglected Doris. But, the Department changed its finding to "unable to determine" based solely upon additional statements made by Bobby.

Doris's medical records from the Ridgeview Rehabilitation & Skilled Nursing facility also depicted that Doris's relationship with Bobby was much different than

Bobby had described and that Doris's health was worsening. In one report, the treating nurse wrote that Doris was:

> very confused this a[.]m[.], has alter [sic] mental status this a[.]m[.][;] doesn't act like she remember[s] things this morning[;] does recognize her nurse and daughter but won't open her eyes to look at either one of us[;] she just keeps saying I trusted you and holds her hand down tight to each other hands still refusing to open eyes.

On another day, the treating nurse noted that:

> [Doris] had a very good day today, she went to the dinning [sic] room and ate very wel[]l for both meals and her daughter was here to visit, spouse not here and resident said she was so glad he couldn't come out today because she was scared of him "he said please never let[]him even if I say I want to, its [sic] only because [I] am very scared of him, because he had choked me before . . . .

The next day, the treating nurse stated that Doris was happy and had a "very good day" because she found out that "her spouse [was] not coming up here." A few days later, the treating nurse recounted that "[Doris] has a good day when her spouse is not here to visit, loves to visit with her daughter . . . and [Doris] said please don't klet [sic] [Bobby] take me home because [I] am scared of him . . . ." Several days later, the treating nurse wrote the following: "husband here again hovering over [Doris][,] telling [Doris] that he has to sell the farm because she won't come home with him[.] [H]usband is very controlling and verbally abusive to [Doris]." Another nurse report stated that:

> Adult protective services here investigating husband[.] [T]he staff and husband were informed that husband is not allowed to take [Doris] out of the facility. Husband very angry about this[;] told nursing that [Doris] has [a] toothache and needs to go to the dentist then says no he was taking her to the [P]arkinsons doctor[;] nursing reminded husband that that appointment was last week[;] when questioned[,] [Doris] denied multiple

times of having any dental pain[;] after being in room alone with husband for an hour or so[,] [Doris] started saying she['s] having dental pain and wants [her] husband to take her to the dentist now.

A subsequent report noted that:

[D]aughter here and does not want [Doris] discharged but husband has POA. Dr. Dailey refused discharge order[;] husband irate. [Doris] told husband that she would stay for 3 more days but that she did not want him to be angry with her. Husband very angry. [D]aughter reported that his meds were just recently changed and that he has a history of freaking out and knocking holes in walls and becoming very agitated and aggressive with [Doris]. Daughter also stated that husband also sleeps for hours at a time all through the day and would be unable to tend to [Doris's] needs and that the environment would be unsafe . . . .

The treating nurse further recounted that: "[Doris] appears to be frightened of her husband. I believe that the husband has been a control[ling] and dominant person and over her the 30 years of her marriage. It appeared that [Doris] is relieved to be able to stay here."

Dwana testified that, at the time the December 11, 2008 will was signed by Doris, Doris was in bad health and that she was unable to read. Doris was unable to drive or walk without assistance. In late 2008, Doris was taking over twenty different medications and relied heavily on Bobby. When meeting with the attorney drafting the will, Bobby was always present. Bobby did not recall Doris meeting privately with the attorney regarding the will or the disposition of the family farm, which was her separate property.

Though the will ultimately left the family farm to Bobby, the record contains evidence that Doris intended for Dwana to receive the farm. The first piece of evidence showing that Doris intended for Dwana to receive the farm is the deed executed prior to

the Wards' European vacation.[1]  In addition, John Whitworth, a pastor at the Mount Carmel Baptist Church, testified that he was present when Doris was in the hospital and that she feared Bobby was going to take the farm.  Doris pleaded with Whitworth to help her prevent Bobby from taking the farm.  Whitworth also recalled that, at one point, Doris made a praise report in church indicating that Dwana owned the family farm.  Even Bobby testified that Doris wanted Dwana to have the farm, though Doris allegedly changed her mind when the December 11, 2008 will was executed.

Though Bobby's testimony was contrary to the jury's findings and much of the evidence presented by Dwana, the jury clearly disbelieved Bobby's self-serving testimony, which it was entitled to do.  *See Carr*, 867 S.W.2d at 28 (stating that the fact-finders are the "sole judges of credibility of the witnesses and the weight to be given to their testimony"); *see also McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (holding that the trier of fact may believe one witness and disbelieve another). Therefore, based on the foregoing, we conclude that there is legally sufficient evidence to support the jury's finding that Bobby exerted undue influence over Doris, at a time when her health and mental capabilities were failing, to subvert Doris's intention to give the family farm to Dwana and that the provisions of the will bequeathing the family farm to Bobby would not have happened but for Bobby's undue influence. *See Rothermel*, 369 S.W.2d at 922; *see also City of Keller*, 168 S.W.3d at 807, 827.  Furthermore, the jury's finding on undue influence is factually sufficient because it is not "so contrary

---

[1] On appeal, Bobby challenges the validity of the deed; however, as noted below, we conclude that the deed was a valid expression of Doris's intent to convey her separate property—the family farm—to Dwana.

to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *See Cain*, 709 S.W.2d at 176. Accordingly, we overrule Bobby's first issue.

## IV. THE DEED TO THE FAMILY FARM

In his third issue, Bobby alleges that the evidence is legally and factually insufficient to prove that a valid deed conveying the family farm to Dwana existed. In his fourth issue, Bobby asserts that if such a deed was valid and existed, the evidence supporting the jury's finding that Doris delivered the deed to Dwana is legally and factually insufficient.

### A. Whether a Valid Deed Existed

Section 5.021 of the property code requires that a deed be in writing and must be subscribed or delivered by the conveyor or the conveyor's agent. TEX. PROP. CODE ANN. § 5.021 (West 2004). However, as noted by the Fourteenth Court of Appeals,

> There is no longer a requirement, as there was at common law, that a deed or instrument to effect conveyance of real property have all the formal parts of a deed formerly recognized at common law or contain technical words. If from the whole instrument a grantor and grantee can be ascertained, and there are operative words or words of grant showing an intention by the grantor to convey title to a real property interest (which is sufficiently described) to the grantee, and is signed and acknowledged by the grantor[,] it is a deed which accomplishes a legally effective conveyance.

*Green v. Canon*, 33 S.W.3d 855, 858 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). "A property description is sufficient if the writing furnishes within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty." *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008).

In this case, the purported deed has been lost or destroyed. In such a case, the existence of the writing can be proven by parol evidence only if the witness saw the writing and can testify clearly as to its contents. *Placer Energy Corp. v. E&S Oil Co.*, 692 S.W.2d 197, 199-200 (Tex. App.—Fort Worth 1985, no writ) (citing *Arreguin v. Cantu*, 609 S.W.2d 639, 641 (Tex. Civ. App.—San Antonio 1980, no writ); *Crosby v. Davis*, 421 S.W.2d 138, 142-43 (Tex. Civ. App.—Tyler 1967, writ ref'd n.r.e.)); *Hutchison v. Massie*, 226 S.W. 695, 696 (Tex. Civ. App.—Amarillo 1920, writ dism'd w.o.j.).

## B. Delivery of the Deed

Conveyance by deed requires delivery of the deed. *See* TEX. PROP. CODE ANN. § 5.021; *see also Noell v. Crow-Billingsley Air Park Ltd. P'ship*, 233 S.W.3d 408, 415 (Tex. App.—Dallas 2007, pet. denied). Delivery of a deed has two elements: (1) the grantor must place the deed within the control of the grantee (2) with the intention that the instrument becomes operative as a conveyance. *Noell*, 233 S.W.3d at 415. The question of delivery of the deed is controlled by the intent of the grantor, and it is determined by examining all the facts and circumstances preceding, attending, and following the execution of the instrument. *Id.* Recording a deed is not necessary to pass title; an unrecorded deed is binding on the parties to the conveyance. *Id.* at 416-17 (citing TEX. PROP. CODE ANN. § 13.001(b) (West 2004) ("The unrecorded instrument is binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument.")).

## C. Discussion

In the present case, only three people knew the contents of the purported deed—Dwana, Doris, and Bobby. Dwana testified that Doris handwrote the deed and placed it on the kitchen table before she and Bobby went on vacation to Europe. Dwana recalled that the deed described the property and that she understood the document to mean that Doris was conveying the family farm to her. The family farm was Doris's separate property to convey as she wished considering she had inherited it from her parents. *See* TEX. FAM. CODE ANN. § 3.001(2) (West 2006) (providing that "the property acquired by the spouse during marriage by gift, devise, or descent" is the spouse's separate property). Bobby remembered the document as well and admitted that the document referenced the seventy-seven-acre tract of land commonly referred to as the family farm. He also admitted that, at one point, Doris intended to give Dwana the family farm but that Doris changed her mind shortly thereafter. When Doris and Bobby left for Europe, Dwana read the document and left it on the kitchen table where Doris had originally put it. Shortly after the Wards returned from Europe, the document was destroyed. Bobby alleged that, after changing her mind about conveying the family farm to Dwana, Doris shredded the document. Dwana testified that when the document disappeared off of the kitchen table, Doris asked her if she had received the document, to which Dwana responded, "No, mother, I did not get it. But it's not on the table . . . ." Both Dwana and Bobby recognized that the document had been signed by Doris and had been given to Dwana. However, Bobby contended in the trial court that the document was not a valid deed because it had not been notarized.

Dwana proffered additional testimony to prove the existence and delivery of the deed. David Paul Holibaugh, Doris's brother in law, testified that he had leased a portion of the family farm in the past. Holibaugh recounted that Doris told him to make out his 2009 lease payment to Dwana. Arden Lockett witnessed Doris sign the deed conveying the family farm to Dwana, and Helen Herron attended a celebratory lunch at the Cotton Patch restaurant with Doris and Bobby where Doris told her that "they were selling the farm to Dwana" because Dwana was "going to get it when [Doris was] gone anyway." Whitworth noted that Bobby and Doris attended his church for approximately ten years and that he visited Doris while she was in the hospital. Whitworth heard Doris exclaim that "Bobby was going to take the farm. She apologized to Dwana over and over again." Doris told Whitworth, "You are my witness, you're my witness. Don't let him [Bobby] take the farm." Whitworth also recalled a Wednesday night prayer meeting where Doris made a praise report indicating that Dwana was the owner of the family farm.

The jury charge contained the following instructions regarding the purported deed:

**Question 2**: Did Doris Ward execute a deed for the 77-acre tract to Dwana that was subsequently lost or destroyed?

You are instructed that a "Deed" is a writing that must be subscribed by the grantor which contains the description of the property conveyed.

You are further instructed to consider all the facts and circumstances preceding, attending, and following the execution, if any, of the deed.

**Question 3**: Did Doris Ward deliver a deed for the 77-acre tract of land to Dwana Phillips?

You are instructed that a Grantor may deliver a deed to the grantee or to an [sic] third person. When a grantor delivers a Deed to a third person, without any reservation on his or her part of the right to recall it, he or she makes an effective delivery of the Deed when he or she instructs the third person to:

a. deliver the deed to the grantee;
b. deliver the deed to the grantee upon the grantor's death; or
c. file the deed with the property records of the county where the property is located.

On appeal, Bobby complains that "the charge was exceedingly bare-bones." However, in making the argument, Bobby does not adequately explain the deficiencies in the jury charge. Furthermore, the record does not reflect that Bobby objected to questions 2 or 3 of the jury charge.[2] *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("[A]ny complaint to a jury charge is waived unless specifically included in an objection.") (citing TEX. R. CIV. P. 274; TEX. R. APP. P. 33.1(a)(1)).

Based on the charge submitted, the jury concluded that Doris had conveyed the family farm to Dwana via a deed and that the deed had been delivered to Dwana. It is undisputed that the purported deed described the property as the seventy-seven acre family farm and that the family did not own another seventy-seven acre tract of land referred to as the family farm. By finding in favor of Dwana regarding the deed, the jury believed, through the testimony of Dwana, Holibaugh, Lockett, Herron, and Whitworth, that Doris conveyed the family farm to Dwana, the deed was valid, and the deed had been delivered to Dwana. *See Carr*, 867 S.W.2d at 28; *see also McGalliard*, 722

---

[2] Bobby did object to other questions contained in the jury charge; however, those questions were immaterial and not answered by the jury.

S.W.2d at 697. And the jury clearly rejected Bobby's testimony that Doris changed her mind about conveying the family farm to Dwana and subsequently shredded the deed herself. *See Carr*, 867 S.W.2d at 28; *see also McGalliard*, 722 S.W.2d at 697.

Based on our review of the record, there is legally sufficient evidence to indicate that Doris, the grantor, handwrote a deed conveying the family farm to Dwana, the grantee; that it was Doris's intent that Dwana receive the family farm; and that Doris delivered the deed, as defined by the charge, to Dwana. *See Green*, 33 S.W.3d at 858; *Crews*, 246 S.W.3d at 645; *Noell*, 233 S.W.3d at 415; *see also Chapman*, 118 S.W.3d at 751; *City of Keller*, 168 S.W.3d at 807, 827. In addition, we cannot say that the jury's findings in questions 2 and 3 are so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust; thus, the evidence is factually sufficient to support the jury's findings as to this issue. *See Francis*, 46 S.W.3d at 242; *Cain*, 709 S.W.2d at 176. Accordingly, we overrule Bobby's third and fourth issue.

## V. ATTORNEY'S FEES

In his fifth issue, Bobby argues that the trial court abused its discretion in awarding Dwana attorney's fees because they were not allowed by statute and are not equitable and just. Dwana asserts that she filed a declaratory judgment action and that the Uniform Declaratory Judgments Act (the "Act") provided a means by which she could recover attorney's fees.

The general rule in Texas is that attorney's fees are recoverable only if authorized by statute or by a contract between the parties. *Intercontinental Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). In her pleadings, Dwana asserted a

declaratory judgment action, requesting the trial court to declare the rights of the parties under the deed. Section 37.009 of the Act provides that "the court may award costs and reasonable and necessary fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2008). Therefore, in light of section 37.009 and because Dwana filed a declaratory judgment action, there is statutory support for the trial court's attorney's fees award. However, our inquiry does not stop here, as Bobby has contended that the attorney's fees were inequitable and unjust.[3]

The Act provides that the trial court "may" award attorney's fees; therefore, the trial court is afforded a measure of discretion in deciding whether to award attorney's fees or not. *See Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998). However, "[t]he Act imposes four limitations on the court's discretion." *Id.* at 21. First, the attorney's fees must be reasonable. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. Generally, "the reasonableness of attorney's fees, the recovery of which is authorized by . . . statute, is a question of fact for the jury's determination." *Bocquet*, 972 S.W.2d at 21 (internal quotations and citations omitted). In addition, the second limitation, that the fees be necessary, is likewise a fact question for the jury. *Id.* The remaining two limitations on attorney's fees under the Act are that they must be equitable and just. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. "Matters of equity are addressed to the trial court's discretion. . . . So is the responsibility for just decisions." *Bocquet*, 972 S.W.2d at 21. The test for abuse of discretion is to determine whether the trial court acted without

---

[3] We note that Bobby has not challenged whether the attorney's fees were reasonable or necessary in this case.

reference to any guiding rules or principles, or whether, under the circumstances of the case, the trial court's actions were arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

Here, Scott Cain, one of Dwana's lawyers, testified as to his experience, the reasonable and necessary rates for attorneys in Johnson County, and the amount of attorney's fees Dwana had incurred during this case. Cain, an attorney with eleven years' experience at the time of trial, billed at $275 per hour, and his co-counsel billed at $195 per hour. According to Cain, as a result of the work done in this case, Dwana incurred $80,000 in attorney's fees. Cain further stated that reasonable and necessary fees would be $30,000 and $10,000 for appeals to this Court and the supreme court, respectively. Besides Cain's testimony, no other evidence as to attorney's fees is included in the record. Based on Cain's testimony, the jury awarded Dwana $80,000 in attorney's fees for work done in the trial court, $30,000 in fees for an appeal to this Court, and $10,000 in fees for an appeal to the supreme court. In its final judgment, the trial court adopted the jury's attorney's fees award.

Because the record does not contain any evidence controverting Cain's testimony about attorney's fees and because Bobby has not adequately explained how the trial court abused its discretion in awarding Dwana attorney's fees, we cannot say that the trial court attorney's fees award constituted an abuse of discretion. *See Bocquet*, 972 S.W.2d at 21; *see also WCM Group, Inc. v. Brown*, 305 S.W.3d 222, 229 (Tex. App.—Corpus Christi 2009, pet dism'd by agr.) ("[A] factual decision is an abuse of discretion only if there is no evidence to support the decision. . . . Merely because a trial court may

decide a matter within its discretion in a different manner than an appellate court does not demonstrate an abuse of discretion." (internal citations omitted)); *City of Temple v. Taylor*, 268 S.W.3d 852, 858 (Tex. App.—Austin 2008, pet. denied) ("A trial court's grant or denial of attorney's fees in a declaratory-judgment action need not be reversed on appeal unless the complaining party clearly shows the trial court abused its discretion." (internal quotations omitted)). In fact, Bobby's assertion that the attorney's fee award was inequitable and unjust is premised upon a finding that the entire jury verdict was incorrect—a finding that we have rejected earlier in this opinion—though we note that a party need not prevail on its declaratory-judgment action to be entitled to an attorney's-fee award. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; *see also Barshop v. Medina County Underwater Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996); *Taylor*, 268 S.W.3d at 858. Based on the foregoing, we affirm the trial court's attorney's fee award and, thus, overrule Bobby's fifth issue.

## VI. CONCLUSION

Having overruled all of Bobby's issues on appeal, we affirm the judgment of the trial court.

AL SCOGGINS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed August 24, 2011
[CV06]